UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GEICO CORPORATION, *et al.,*

      Plaintiffs,

                              Case No. 16-13189

v.

                              Hon. Marianne O. Battani

AUTOLIV, INC., *et al.,*

      Defendants.

_____/

**OPINION AND ORDER REGARDING DEFENDANTS'**
**COLLECTIVE MOTION TO DISMISS SECOND AMENDED COMPLAINT**

## I.    INTRODUCTION

Plaintiffs GEICO Corporation and a number of affiliated entities (collectively "GEICO") brought this suit on September 2, 2016, asserting federal antitrust and state law claims against fourteen auto parts manufacturers and suppliers arising from alleged conspiracies among the Defendant manufacturers and suppliers to fix prices, rig bids, and allocate the markets for sixteen auto parts. GEICO was a putative member of the proposed liability and settlement classes in a number of the class action suits comprising *In re Automotive Parts Antitrust Litigation,* No. 12-md-02311. However, GEICO has elected to opt out of the settlement classes certified to date in this multidistrict litigation ("MDL"), and to instead pursue its own claims as, in effect, an indirect purchaser of certain of the auto parts involved in the MDL.

Before the Court is Defendants' collective motion to dismiss GEICO's second amended complaint. Among other grounds for dismissal, Defendants contend (i) that

GEICO has alleged an implausible single conspiracy involving sixteen auto parts or, alternatively, has improperly joined sixteen separate conspiracies in a single suit, (ii) that GEICO lacks both Article III and antitrust standing, (iii) that GEICO's claims have been released by virtue of the settlements reached by GEICO's insureds, (iv) that GEICO's claims are barred by the relevant statutes of limitation, and (v) that GEICO's state law claims are subject to dismissal for a number of reasons.

On November 9, 2017, the Court heard oral argument on Defendants' motion.[1] For the reasons set forth below, Defendants' motion is **GRANTED IN PART and DENIED IN PART**, and Plaintiffs are granted leave to file amended pleadings in accordance with the Court's rulings.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff GEICO offers several forms of insurance coverage, including automobile insurance. It brought this suit under federal antitrust law and the laws of a number of states, alleging that the fourteen Defendant auto part manufacturers and suppliers unlawfully conspired among themselves and with other non-party co-conspirators to fix prices, rig bids, and allocate the markets for sixteen auto parts: air flow meters, alternators, ATF warmers, automotive wire harness systems, electronic throttle bodies, fuel injection systems, high intensity discharge ("HID") ballasts, ignition coils, inverters, motor generators, occupant safety restraint systems, radiators, starters, steering angle sensors, switches, and valve timing control devices. The named Defendants include (i)

---

[1]The Court also heard argument on a separate motion to dismiss brought by Defendants Lear Corporation and Kyungshin-Lear Sales & Engineering, LLC. This motion will be addressed in a separate opinion and order.

Autoliv, Inc., and its subsidiaries, Autoliv ASP, Inc., Autoliv B.V. & Co. KG, Autoliv Safety Technology, Inc., and Autoliv Japan Ltd.; (ii) Hitachi Automotive Systems, Ltd. ("HIAMS"); (iii) Lear Corporation and an affiliated joint venture, Kyungshin-Lear Sales and Engineering, LLC; (iv) Panasonic Corporation and its subsidiary, Panasonic Corporation of North America; (v) T.RAD Co., Ltd. and its subsidiary, T.RAD North America; and (v) TRW Deutschland Holding GmbH and its affiliate, ZF TRW Automotive Holdings Corporation.

According to GEICO's complaint, each of the sixteen auto parts at issue is installed in new cars as part of the automotive manufacturing process.  In particular, original equipment manufacturers ("OEMs") purchase these parts from automotive parts suppliers, including Defendants, by issuing requests for quotes ("RFQs") to the suppliers and selecting winning bidders.  These supply arrangements typically last between four and six years.  In addition, Defendants and other auto parts suppliers sell the auto parts at issue to automotive repair professionals, who install these parts in automobiles to replace worn out, defective, or damaged parts.

In 2010, authorities in the United States, the European Union, and Japan began investigating a suspected conspiracy among auto part manufacturers and suppliers to engage in anticompetitive cartel conduct.  Over time, a number of manufacturing firms and executives have pleaded guilty to conspiracies to fix prices, rig bids, or allocate the market for specific auto parts.  The firms that have pleaded guilty and paid criminal fines include five Defendants in this case:  Autoliv, Inc., HIAMS, Panasonic Corporation, T.RAD Co. Ltd., and TRW Deutschland Holding GmbH.  In addition, the guilty pleas that

3

resulted from this antitrust investigation encompass each of the sixteen auto parts at issue here.

Beginning in 2011, civil antitrust suits were brought in federal district courts throughout the United States on behalf of various classes of plaintiffs who alleged that they were injured as a result of the auto part price-fixing conspiracies revealed in the above-cited government investigations. On February 7, 2012, the United States Judicial Panel on Multidistrict Litigation transferred these actions to the Eastern District of Michigan, and this Court subsequently entered a series of orders to coordinate and consolidate these suits in multidistrict litigation designated as *In re Automotive Parts Antitrust Litigation,* No. 12-md-02311. Generally speaking, this litigation has been organized into separate class actions for each of the dozens of auto parts that were the subject of alleged price-fixing conspiracies among the suppliers of these parts.

GEICO alleges that it was a putative member of the proposed classes in sixteen of these suits — *i.e.,* the class actions corresponding to the sixteen auto parts identified in the present complaint. In April of 2016, GEICO elected to opt out of the settlement classes certified in these class actions. Instead, it brought the present suit on September 2, 2016, asserting federal antitrust and state law claims similar to those being pursued in the ongoing multidistrict litigation. In support of these claims brought on its own behalf, GEICO alleges that it has been injured by Defendants' alleged conspiracies to fix the prices of the designated sixteen auto parts, by virtue of (i) its own purchase of these auto parts for use in a fleet of vehicles that it owns, and (ii) its reimbursement of insureds and third-party claimants for either (a) payments made to repair professionals involving the replacement of these auto parts, or (b) the full value of

4

a vehicle that has been declared a total loss.  Defendants now seek the dismissal of

GEICO's federal and state law claims on a variety of grounds.

## III.    STANDARD OF REVIEW

In their present motion, Defendants ask the Court to dismiss GEICO's second

amended complaint under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction,

and under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be

granted.  In addressing Defendants' jurisdictional challenge under the first of these two

Rule 12 provisions, the Court "takes the allegations in the complaint as true," inquiring

whether these allegations establish a basis for the exercise of subject matter

jurisdiction.  *Gentek Building Products, Inc. v. Steel Peel Litigation Trust,* 491 F.3d 320,

330 (6th Cir. 2007).  Yet, "conclusory allegations or legal conclusions masquerading as

factual conclusions will not suffice" to withstand a properly supported Rule 12(b)(1)

motion to dismiss.  *O'Bryan v. Holy See,* 556 F.3d 361, 376 (6th Cir. 2009) (internal

quotation marks and citation omitted).

Similarly, when determining whether GEICO's claims are subject to dismissal

under Rule 12(b)(6) for failure to state a claim, the Court must construe the complaint in

a light most favorable to Plaintiff and accept all well-pleaded factual allegations as true.

*League of United Latin American Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir.

2007).  Again, however, "the tenet that a court must accept as true all of the allegations

contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556

U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009).

Moreover, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss

does not need detailed factual allegations, a plaintiff's obligation to provide the grounds

of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964-65 (2007) (internal quotation marks, alteration, and citations omitted). Rather, to withstand a motion to dismiss, the complaint's factual allegations, accepted as true, "must be enough to raise a right to relief above the speculative level," and to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570, 127 S. Ct. at 1965, 1974. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949.

The Supreme Court has emphasized that this plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not shown — that the pleader is entitled to relief." *Iqbal,* 556 U.S. at 679, 129 S. Ct. at 1950 (internal quotation marks, alteration, and citation omitted). If a plaintiff does "not nudge[] [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974.

## IV.   ANALYSIS

### A.   GEICO's Complaint Properly Pleads a Separate Conspiracy for Each of the Auto Parts Involved in This Case.

As the first of the several challenges advanced in their motion, Defendants argue that GEICO's complaint "posits farfetched allegations of an overarching, sixteen-part conspiracy involving all Defendants." (Dkt. 62, Defendants' Motion to Dismiss, Br. in Support at 3.) In Defendants' view, this claimed conspiracy encompassing all of the Defendant auto part suppliers is not plausible for two reasons: (i) all but two of these suppliers make completely different auto parts, and (ii) GEICO has failed to alleged specific facts in support of its conclusory assertion that "[e]ach Defendant acted as the principal of or agent for the other Defendants with respect to the acts, violations, and common course of conduct alleged" in the complaint, (Dkt. 53, Second Amended Complaint ("SAC") at ¶ 41).

In response, GEICO asserts that Defendants have "misconstrued [its] conspiracy allegations," and that its complaint is more properly read as "alleg[ing] sixteen separate conspiracies, each involving different Defendants, different parts and different price fixing arrangements." (Dkt. 65, Plaintiffs' Response Br. at 5-6.) GEICO further denies any intention to "allege that each Defendant acted as a principal or agent for [all of] the other Defendants" across all sales of the sixteen parts referenced in the complaint. Instead, it insists that the allegations in question link each Defendant only to those other Defendants or non-party co-conspirators who are involved in alleged price-fixing activities with respect to a particular part. (*Id.* at 6.) As discussed below, the Court agrees with GEICO that Defendants' suggested reading of the complaint is not tenable.

7

In the Court's view, the complaint is properly construed as pleading sixteen separate part-specific conspiracies, with each Defendant auto part supplier facing liability only for the particular part-specific conspiracies in which it is alleged and found to have joined.

As Defendants observe, this Court has previously addressed (and rejected) an attempt by indirect purchaser plaintiffs ("IPPs") in the multidistrict litigation to combine multiple separate part-specific cases into a consolidated complaint alleging a single, overarching conspiracy to fix the prices of eighteen different auto parts. *See In re Automotive Parts Antitrust Litigation,* No. 12-md-02311, 2016 WL 8200512, at *3-*4 (E.D. Mich. April 13, 2016). In so ruling, the Court relied in part on the assessment of the U.S. Department of Justice ("DOJ"), following "six years of grand jury investigation," that the auto part suppliers that were the target of the DOJ's investigation "engaged in various and separate and independent conspiracies" that each involved a particular component part. *Id.* at *4. The Court further noted the absence of allegations "of deals between makers of different component parts," of competition among the defendant part suppliers "for the sales of all eighteen parts," or of a given defendant's knowledge of the conduct and actions of other defendants regarding parts that it did not sell. *Id.*

As GEICO correctly explains, this Court's ruling in the multidistrict litigation is readily distinguishable, where the IPPs in that case sought to plead a "massive hub-and-spoke conspiracy" that is nowhere to be found in the present complaint. (Plaintiffs' Response Br. at 6.) Here, in contrast, at the very outset of the portion of the complaint captioned "Factual Allegations," GEICO refers to Defendants' "[c]onspiracies" to "fix prices, rig bids and allocate markets" for sixteen auto parts. (SAC at ¶ 44.) GEICO then proceeds to allege sixteen separate price-fixing conspiracies, one for each auto

8

part identified in the complaint, and each involving a subset of one or more specific Defendants along with unnamed co-conspirators.  (*See id.* at ¶¶ 45-125.)  Immediately following these part-specific allegations, the complaint features a section captioned "Defendants and Their Co-Conspirators Entered into Multiple Auto Part Conspiracies," in which GEICO expressly alleges (i) that "Defendants and their co-conspirators entered into numerous Auto Parts conspiracies," and (ii) that according to a DOJ official, "there were more than a dozen separate [auto part] conspiracies each operating independently."  (*Id.* at ¶ 126.)  Finally, GEICO enumerates each such part-specific conspiracy, setting forth the time periods of these conspiracies and the particular Defendant suppliers involved in each.  (*See id.* at ¶¶ 126(a)-(p).)  Against this backdrop, Defendants cannot succeed in their argument that GEICO seeks to hold them jointly and severally liable for an overarching conspiracy to fix the prices of sixteen auto parts.

To be sure, Defendants contend in their reply brief that GEICO's complaint lacks detailed allegations as to "specific meetings or instances of collusive conduct" through which the Defendant suppliers carried out the part-specific conspiracies in which they allegedly participated.  (Dkt. 67, Defendants' Reply Br. at 2.)  Similarly, Defendants observe that GEICO identifies only one or, occasionally, two specific Defendants as participants in each conspiracy, "leaving both Defendants and the Court to guess . . . in which of the sixteen component part conspiracies any Defendant allegedly participated." (*Id.*)  Yet, because Defendants raise these attacks on the sufficiency of GEICO's allegations of conspiracy for the first time in their reply brief, the Court elects not to consider them.  *See Sundberg v. Keller Ladder,* 189 F. Supp.2d 671, 682-83 (E.D. Mich. 2002) (declining to address an argument raised for the first time in a reply brief).

9

In any event, the Court has previously rejected similar challenges to the sufficiency of the plaintiffs' allegations of a price-fixing conspiracy in its rulings in the multidistrict litigation, *see, e.g., In re Automotive Parts Antitrust Litigation (In re Fuel Senders),* 29 F. Supp.3d 982, 995-96 (E.D. Mich. 2014) ("*Fuel Senders")*; *In re Automotive Parts Antitrust Litigation (In re Instrument Panel Clusters),* 2014 WL 2993753, at *5-*6 (E.D. Mich. July 3, 2014) ("*Instrument Panel Clusters")*, and there is no basis for departing from these rulings here. Accordingly, GEICO's allegations of separate part-specific conspiracies are sufficient to withstand scrutiny under Rule 12(b)(6).

### B. Although GEICO Has Improperly Joined Its Sixteen Part-Specific Conspiracy Claims in a Single Suit, This Misjoinder Does Not Warrant the Dismissal of This Action in Its Entirety.

Even if — as the Court has now ruled — GEICO's complaint is construed as alleging sixteen separate part-specific conspiracies, Defendants argue that the complaint nonetheless runs afoul of Fed. R. Civ. P. 20(a)(2) by joining multiple claims and defendants in a single action despite the absence of common transactions or occurrences. Although there is some degree of overlap in the Defendant suppliers involved in the sixteen alleged conspiracies, Defendants contend that this alone does not suffice to permit joinder, where the facts and evidence needed to prove each conspiracy will be unique to a given part, the market for the part, and the specific suppliers of the part. Defendants further assert that joinder would unfairly prejudice those suppliers that are involved in only one or a few of the sixteen alleged conspiracies. As discussed below, the Court agrees that these sixteen alleged conspiracies may not be joined in a single suit, but finds that the remedy sought by Defendants — *i.e.,* the dismissal of GEICO's complaint in its entirety — is inappropriate

10

and would not serve the interests of the parties or of judicial economy.  Rather, the

Court directs GEICO to commence a separate suit for each of the alleged part-specific

conspiracies.  The parties are further instructed to negotiate the terms of a proposed

order to facilitate the efficient management and coordination of these several part-

specific actions.

Under Fed. R. Civ. P. 20(a)(2), parties "may be joined in one action as

defendants if," as relevant here:  (i) the claims against them "aris[e] out of the same

transaction, occurrence, or series of transactions or occurrences," and (ii) "any question

of law or fact common to all defendants will arise in the action."  The standards for

permissive joinder under this Rule are "liberally construed," in order to "promote trial

convenience and expedite the final determination of disputes" by avoiding multiple

lawsuits where possible.  *Patrick Collins, Inc. v. John Does 1-21,* 282 F.R.D. 161, 166

(E.D. Mich.) (internal quotation marks and citations omitted), *adopted at* 286 F.R.D. 319

(E.D. Mich. 2012).  In this manner, permissive joinder serves the larger objective under

the Federal Rules of "entertaining the broadest possible scope of action consistent with

fairness to the parties."  *Patrick Collins,* 282 F.R.D. at 166 (internal quotation marks and

citation omitted).  "The permissive joinder of defendants is also encouraged for

purposes of judicial efficiency."  282 F.R.D. at 166.

To warrant the joinder of its sixteen part-specific conspiracy claims in a single

suit, GEICO must show that these claims (i) "aris[e] out of the same transaction,

occurrence, or series of transactions or occurrences," and (ii) involve a "question of law

or fact common to all defendants."  Fed. R. Civ. P. 20(a)(2)(A)-(B).  GEICO states

without contradiction that the conspiracies alleged in its complaint implicate common

11

questions of fact and law, including (i) whether GEICO's reimbursement of its insureds for auto parts qualifies as antitrust injury, and (ii) whether evidence of the business practices of a particular Defendant auto part supplier shows that this supplier participated in more than one of the alleged conspiracies.  Thus, the dispositive issue presented by Defendants' claim of misjoinder is whether the part-specific conspiracies alleged by GEICO arise out of the "same transaction, occurrence, or series of transactions or occurrences."

In addressing this question, the courts have inquired whether "there is a logical relationship between the separate causes of action" that the plaintiff seeks to join in a single case.  *In re EMC Corp.,* 677 F.3d 1351, 1358 (Fed. Cir. 2012); *see also Mosley v. General Motors Corp.,* 497 F.2d 1330, 1333 (8th Cir. 1974); *Stojcevski v. County of Macomb,* 143 F. Supp.3d 675, 682-83 (E.D. Mich. 2015).  "The logical relationship test is satisfied if there is substantial evidentiary overlap in the facts giving rise to the cause of action against each defendant."  *EMC Corp.,* 677 F.3d at 1358.  "Stated differently, the plaintiffs' claims must share an aggregate of operative facts."  *Stojcevski,* 143 F. Supp.3d at 683 (internal quotation marks, citations, and emphasis omitted).  This is a flexible and case-specific standard, and "the mere fact that a case involves independent actors as defendants does not necessarily bring the case outside the scope of Rule 20."  *EMC Corp.,* 677 F.3d at 1357-58.

Applying this standard here, the part-specific conspiracies alleged by GEICO lack a sufficient logical relationship or evidentiary overlap to permit joinder under Rule 20(a)(2).  To establish a given part-specific conspiracy, GEICO must show that the particular Defendant suppliers involved in this conspiracy entered into an agreement to

12

fix prices, rig bids, or otherwise manipulate the market for a specific auto part. As Defendants observe, the evidence needed to make this showing will be largely unique to the limited subset of Defendants suppliers involved in the market for the component part at issue and the characteristics of this particular market. In contrast, the remaining Defendants joined in GEICO's suit will have little or no involvement in or relationship to the operative facts for this conspiracy. *See Michaels Building Co. v. Ameritrust Co., N.A.,* 848 F.3d 674, 682 (6th Cir. 1988) (affirming the district court's finding of improper joinder of a defendant lender, where the various loan transactions giving rise to the plaintiffs' claims "involve[d] different banks, different contracts and different terms"). Even as to those Defendant suppliers that are involved in more than one of the alleged conspiracies, the facts that establish a supplier's participation in one such conspiracy — *e.g.,* evidence of meetings, discussions, or other opportunities to collude in the setting of prices or allocation of the market — are likely to be largely if not entirely distinct from the facts that demonstrate this supplier's involvement in another part-specific conspiracy. In addition, Defendants point to the prejudice and additional expense faced by suppliers that are involved in only one or two of the sixteen alleged conspiracies but nonetheless must participate in large-scale discovery efforts and other pretrial proceedings encompassing all of these alleged conspiracies.

Although the Court has not addressed precisely this issue in the multidistrict litigation, it has cited similar considerations in denying a request by IPPs to consolidate eighteen separate part-specific cases into a single suit. In so ruling, the Court explained:

> [A]lthough the alleged conduct by Defendants follows a similar pattern, the facts are not the same.  [In addition], the existence of different Defendants weighs against consolidation.  Even though the [part-specific cases] involve overlapping parties, there are twenty-two different Defendant Groups, six Settling Defendant Groups, and eighteen different product markets.  Consolidation would be unfairly prejudicial to the eighteen Defendants who are parties in only one or two of the eighteen [part-specific cases] and to those Defendants that have never pleaded guilty.

*In re Automotive Parts Antitrust Litigation,* 2016 WL 8200512, at *2.  Accordingly, the Court concluded that "rather than simplify[ing] this already complex litigation, consolidation will serve only to confuse the legal claims/defenses of the parties and delay a definite outcome for the parties," and thus "would not serve judicial economy or the convenience of the court and of the parties."  *Id.*  These same factors are present here, and militate against GEICO's joinder of sixteen separate part-specific conspiracies in a single suit.

It remains to determine the proper remedy for GEICO's misjoinder.  As Defendants recognize, "[m]isjoinder of parties is not a ground for dismissing an action."  Fed. R. Civ. P. 21; *see also Letherer v. Alger Group, L.L.C.,* 328 F.3d 262, 267 (6th Cir. 2003), *overruled on other grounds as recognized in Blackburn v. Oaktree Capital Management, LLC,* 511 F.3d 633, 636 (6th Cir. 2008).  Nonetheless, the Court has wide latitude in fashioning appropriate relief, including "add[ing] or drop[ping] a party" or "sever[ing] any claim against a party."  Fed. R. Civ. P. 21; *see also Letherer,* 328 F.3d at 267.

In Defendants' view, the proper remedy here would be to dismiss this suit and require GEICO to file separate part-specific actions.  (*See* Defendants' Motion, Br. in Support at 6 n.4.)  Yet, to the extent that this would inconvenience the parties or fail to

serve judicial economy, the Court has recognized its "expansive" authority to implement procedures that will assist in coordinating and administering GEICO's several part-specific suits. *In re Automotive Parts Antitrust Litigation,* 2016 WL 8200512, at *2; *see also* Fed. R. Civ. P. 42(a) (authorizing the Court to "join for hearing or trial any or all matters at issue in the actions" and to "issue any other orders to avoid unnecessary cost or delay"). Accordingly, though the Court agrees with Defendants that the eighteen part-specific conspiracies alleged by GEICO are not properly joined in a single suit, it elects to address this misjoinder by (i) directing GEICO to sever each of its part-specific conspiracy claims into a separate suit, and (ii) instructing the parties to negotiate the terms of a proposed order to facilitate the efficient management and coordination of the sixteen part-specific actions filed by GEICO in accordance with the Court's ruling.

### C.     Although GEICO Has Failed in Certain Respects to Sufficiently Plead the Elements of Article III Standing for Each of the Federal and State Law Claims Asserted in Its Complaint, It Will Be Granted Leave to Address These Deficiencies in Amended Pleadings.

Defendants next mount three separate challenges to GEICO's Article III standing to pursue the federal and state law claims asserted in its complaint. First, although GEICO claims that the payments it made in its role as insurer were adversely affected by Defendants' alleged price-fixing schemes, Defendants observe that some of these payments did not entail the purchase of auto parts from any of the Defendant suppliers, and they argue that GEICO lacks "standing to sue for alleged overcharges on [a]uto [p]arts that were never purchased." (Defendants' Motion, Br. in Support at 7.) Next, Defendants maintain that GEICO lacks standing to sue under "the laws of any of the thirty-two states and the District of Columbia under which it seeks to recover," where it

fails to allege in its complaint that it made any excessive payments for relevant auto parts "in any particular state." (*Id.* at 8.) Finally, Defendants contend that the allegations of GEICO's complaint fail to forge the requisite causal link between Defendants' alleged overcharges for auto parts and increased payments made by GEICO under its contracts with its insureds. The Court addresses each of these challenges in turn, after first summarizing the law governing Article III standing.

To demonstrate Article III standing, a plaintiff must first allege that it has suffered an "injury in fact" — that is, "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S. Ct. 2130, 2136 (1992) (internal quotation marks and citations omitted). Second, the alleged injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan,* 504 U.S. at 560, 112 S. Ct. at 2136 (internal quotation marks, alterations, and citation omitted). Third, the plaintiff must allege that a favorable federal court decision is likely to redress the alleged injury. 504 U.S. at 561, 112 S. Ct. at 2136.

As the "party invoking federal jurisdiction," GEICO "bears the burden of establishing these elements." 504 U.S. at 561, 112 S. Ct. at 2136. Because Article III standing is "not [a] mere pleading requirement[] but rather an indispensable part of the plaintiff's case," each element of this standard "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." 504 U.S. at 561, 112 S. Ct. at 2136. At the present pleading stage of this case, "general factual

16

allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim."  504 U.S. at 561, 112 S. Ct. at 2137 (internal quotation marks, alteration, and citation omitted).

### 1. GEICO Has Sufficiently Pleaded Injury in Fact, Even as to Those Transactions That Do Not Necessarily Involve the Purchase of a Relevant Auto Part.

As their first challenge to GEICO's allegations of Article III standing, Defendants argue that GEICO cannot establish the "injury in fact" element of standing with respect to alleged transactions that did not entail the purchase of any of the auto parts at issue in this case.  Specifically, Defendants take issue with GEICO's assertion that it was injured each time it made a payment to an insured or third-party claimant as reimbursement for the cost of vehicle repairs.  (*See, e.g.,* SAC at ¶ 49.)  Defendants observe that the recipient of such a payment might elect not to repair his vehicle and instead "simply pocket the claim payment."  (Defendants' Motion, Br. in Support at 7.)  Similarly, Defendants point out that when GEICO reimburses an insured or third-party claimant for the value of a vehicle that is declared a total loss, (*see, e.g.,* SAC at ¶ 49), this payment almost certainly does not lead to the purchase of any of the auto parts at issue here.  In such cases where "there is no sale of an [a]uto [p]art at all" flowing from GEICO's payment to an insured or third-party claimant, Defendants contend that "GEICO simply does not have standing to sue for alleged overcharges on Auto Parts that were never purchased."  (Defendants' Motion, Br. in Support at 7.)

In response, GEICO first observes that the claims asserted in its complaint do not rest solely on reimbursement payments to insureds or third-party claimants.  Rather,

17

the complaint also alleges (i) that GEICO itself purchased the auto parts at issue, (*see, e.g.,* SAC at ¶¶ 17-25, 49),[2] and (ii) that GEICO "directly paid repair professionals" for auto parts "after the repair professional[s] repaired [the] insureds' or claimants' vehicles," (*see, e.g., id.* at ¶ 49).  Because auto parts were purchased in these transactions, GEICO has adequately pleaded the "injury in fact" element of Article III standing through its allegations of injury flowing from the supra-competitive prices charged by Defendants for these parts.  (*See id.* at ¶¶ 8, 164-65.)

Admittedly, although Defendants do not squarely raise this issue in their motion, the Supreme Court has cautioned that "standing is not dispensed in gross," and that a plaintiff instead "must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."  *Davis v. Federal Election Commission,* 554 U.S. 724, 734, 128 S. Ct. 2759, 2769 (2008) (internal quotation marks, alteration, and citations omitted).  The question then becomes whether GEICO's direct purchases of auto parts and its reimbursement payments to insureds and third-party claimants give rise to discrete "claims" for which GEICO must separately establish its Article III standing, or

---

[2]In its brief in opposition to Defendants' motion, GEICO indicates that it made at least some of these direct purchases in its capacity as the owner of "thousands of vehicles (provided for use by its adjusters and other employees) as part of its fleet program."  (Plaintiffs' Response Br. at 4.)  As Defendants observe, however, these alleged purchases as a fleet owner are not expressly identified as such in the complaint, and a plaintiff ordinarily may not "amend [its] complaint through a response brief." *Jocham v. Tuscola County,* 239 F. Supp.2d 714, 732 (E.D. Mich. 2003).  Nonetheless, given that GEICO has been directed to file a separate suit for each of the eighteen part-specific conspiracies identified in its present complaint, the Court will allow GEICO to address this pleading deficiency when it commences these separate actions, particularly where it already has alleged that it made direct purchases of relevant auto parts, and simply did not identify the fleet-owner context in which some of these purchases were made.

18

whether GEICO's direct purchases and reimbursement payments are more properly characterized as separate items of damages that GEICO may or may not be entitled to recover upon establishing its overarching claim of a price-fixing conspiracy.

The parties' briefs have little to offer on this subject. Defendants cite a number of cases for the proposition that a plaintiff's purchase of a particular item does not confer standing to bring claims involving different, albeit similar, items that the plaintiff did not purchase. *See, e.g., Dapeer v. Neutrogena Corp.,* 95 F. Supp.3d 1366, 1373 (S.D. Fla. 2015) (holding that the named plaintiff in a putative class action "lack[ed] Article III standing to bring claims on behalf of the Neutrogena [sunscreen] products he did not purchase"); *Ferrari v. Best Buy Co.,* No. 14-2956, 2015 WL 2242128, at *9 (D. Minn. May 12, 2015) (concluding that the named plaintiff "lack[ed] standing to assert claims on behalf of the class for televisions that he did not purchase or advertising that he did not see or rely upon"); *Granfield v. NVIDIA Corp.,* No. 11-05403, 2012 WL 2847575, at *6 (N.D. Cal. July 11, 2012) ("[W]hen a plaintiff asserts claims based both on products that she purchased and products that she did not purchase, claims relating to products not purchased must be dismissed for lack of standing."). Yet, these cases are wholly inapposite here, given GEICO's express allegations that it directly purchased and/or made reimbursement payments involving each of the relevant auto parts at issue. (*See SAC* at ¶¶ 17-25, 49, 54, 59, 64, 69, 74, 79, 84, 89, 94, 99, 105, 110, 115, 120, 125.) The decisions cited by Defendants, in contrast, involve efforts by plaintiffs to derive Article III standing from the purchases of putative class members or third parties who are not yet (and may never be) parties to the suit. These cases therefore have nothing whatsoever to say about the salient issue here — namely, whether GEICO's own direct

19

purchases and various types of reimbursement payments are properly viewed as giving rise to separate claims that necessitate their own distinct showings of Article III standing.

GEICO's discussion on this point is similarly unhelpful.  GEICO first states, as a matter of *ipse dixit* and without citation to authority, that apart from its direct purchases, it "has standing simply as an insurance company."  (Plaintiffs' Response Br. at 10.)  GEICO further contends that Defendants' allegedly anticompetitive conduct "illegally inflated the prices GEICO pays, whether GEICO pays for [a]uto [p]arts for its cars, pays repair shops directly or pays the insured or claimants."  (*Id.*)  Unfortunately, GEICO fails to tie these assertions in its response brief to specific allegations in its complaint, and the Court's own review of this pleading has uncovered only scant and largely conclusory support for the proposition that Defendants' allegedly anticompetitive conduct has inflicted injury on GEICO in the form of higher reimbursement payments to insureds or third-party claimants, even in instances when these insurance transactions did not entail the purchase of relevant auto parts.  (*See, e.g.,* SAC at ¶¶ 164-68, 170, 193.)

Although the question is a close one, the Court finds that GEICO's allegations, albeit somewhat threadbare, are sufficient to establish the injury-in-fact element of Article III standing for each of the claims GEICO has asserted, whether as a direct purchaser or as an insurer reimbursing its insureds or third-party claimants.  As explained, GEICO has affirmatively alleged that it sustained injuries in both capacities. On the other hand, its complaint admittedly lacks supporting detail as to precisely how Defendants' alleged price-fixing activities might have led to higher reimbursement payments for insurance claims that did not entail the purchase of relevant auto parts.

Yet, this Court has observed in a similar context that such an "elongated . . . chain" of allegations linking price-fixing activities to increased payments poses "difficulties of proof, not pleading deficiencies."  *Fuel Senders,* 29 F. Supp.3d at 998.  "At this stage of the proceedings," where GEICO's claims are evaluated on the pleadings alone, GEICO need not allege precisely "how [it] intend[s] to establish" each of its theories of damages.  29 F. Supp.3d at 998.   Moreover, GEICO is not altogether relieved of the obligation to put forward allegations linking Defendants' allegedly anticompetitive activities to resulting injury:  as discussed below, GEICO must overcome similar obstacles to satisfy the "fairly traceable" element of Article III standing and the requirement of antitrust standing.

> **2.     GEICO Has Not Adequately Alleged Its Standing to Pursue Claims Under the Laws of Each of the States Referenced in Its Complaint, But It Will Be Granted Leave to Rectify This Pleading Deficiency.**

Defendants' next Article III challenge is directed at GEICO's assertion of claims under the laws of thirty-two states and the District of Columbia.  In Defendants' view, GEICO lacks standing to sue under the law of a given state in the absence of allegations that it made a payment, and hence suffered an injury, in that specific state. Because GEICO "does not allege any [p]ayments in any particular state," Defendants contend that its "conclusory assertions that it paid for something somewhere do[] not give it the right to sue under the laws of the thirty-three jurisdictions cited in the Complaint."  (Defendants' Motion, Br. in Support at 8.)

In response, GEICO first suggests that it has, in fact, alleged that it suffered an actual injury in each of the states listed in the complaint.  Citing Michigan as an

example, GEICO points to its allegations that Defendants' conspiratorial activities (i) produced "artificially high" prices for the relevant auto parts and "eliminated price competition" for these parts "throughout Michigan," (ii) "deprived GEICO and its insureds and claimants of free and open competition" in the markets for these auto parts, and (iii) "resulted in GEICO paying supra-competitive, artificially high prices" for these auto parts. (SAC at ¶ 211(a).) GEICO further alleges that "Defendants' illegal conduct substantially affected commerce in Michigan," and that GEICO "has been injured in its business and property" as a "direct and proximate result" of this unlawful conduct. (*Id.* at ¶¶ 211(b)-(c).) GEICO makes essentially the same allegations for each of the other thirty-one states and the District of Columbia. As Defendants correctly observe, however, these allegations fall short of a direct assertion that GEICO actually purchased an auto part or made a reimbursement payment in Michigan or any other particular state.

Nonetheless, GEICO insists that it is reasonable to assume that it has made a purchase or reimbursement payment in each of the relevant states, where it is "the second largest automobile insurer in the United States" and "issu[es] insurance policies and adjust[s] claims in all 50 states and the District of Columbia." (Plaintiffs' Response Br. at 12.) Indeed, GEICO flatly states in its response brief that it has "conducted business, purchased parts and made payments for parts in every state and the District of Columbia." (*Id.*) Yet, these supposed facts about the nature and extent of GEICO's auto part purchases and insurance business are nowhere to be found in the complaint, and Defendants aptly cite the principle that "[s]tanding cannot be inferred" but instead "must affirmatively appear in the record." *Delaware Valley Toxics Coalition v. Kurz-*

22

*Hastings, Inc.,* 813 F. Supp. 1132, 1139 (E.D. Pa. 1993). As confident as GEICO might be that it will ultimately be able to produce evidence of a purchase or payment in each of the relevant states that was adversely impacted by Defendants' allegedly anticompetitive activities, Defendants quite rightly insist that GEICO still must plead this "injury in fact" element of its Article III standing in order to pursue claims under the laws of each of the jurisdictions identified in its complaint.

To be sure, Defendants acknowledge this Court's holding in the multidistrict litigation that it may be appropriate to defer a standing inquiry until the plaintiff has an opportunity to engage in discovery that could uncover evidence of relevant transactions and resulting injury in each of the pertinent jurisdictions. *See, e.g., Fuel Senders,* 29 F. Supp.3d at 1000. Yet, Defendants correctly observe that the courts typically adopt this approach in class actions, where the named plaintiffs generally lack information about transactions engaged in by members of the putative plaintiff class. Here, in contrast, GEICO's claims rest solely upon transactions in which this insurer itself participated. Thus, there is no justification in this case for a wait-and-see approach to the requirement that a plaintiff must plead each of the elements of Article III standing.

Nonetheless, even though GEICO's present pleading falls short of this standard, this is not the end of the matter. The Court has previously determined that GEICO should be granted leave to bring a separate suit for each of the part-specific conspiracies alleged in its complaint, and to address other pleading deficiencies in its existing complaint. Accordingly, GEICO may avail itself of this opportunity to ensure that it has properly alleged injuries sustained in each of the jurisdictions identified in its complaint.

**3.      GEICO Has Sufficiently Alleged That Its Alleged Injuries Are Fairly Traceable to Defendants' Allegedly Anticompetitive Conduct.**

As their final challenge to GEICO's Article III standing, Defendants argue that GEICO has failed to plead the requisite causal connection between Defendants' alleged price-fixing conspiracies and resulting injury to GEICO. It bears emphasis, as a threshold matter, that this is not an across-the-board challenge. Most notably, in transactions in which GEICO itself allegedly purchased the auto parts at issue, Defendants concede that such allegations, taken as true, suffice to establish a causal connection between Defendants' alleged price-fixing activities and GEICO's payment of allegedly supra-competitive prices for these parts.

Moreover, in its capacity as owner of a fleet of vehicles, GEICO is similarly situated to the End-Payor Plaintiffs ("EPPs") in the multidistrict litigation. As GEICO observes, this Court has rejected challenges to the Article III standing of EPPs. *See, e.g., Fuel Senders,* 29 F. Supp.3d at 997-99; *Instrument Panel Clusters,* 2014 WL 2993753, at *7-*8; *In re Automotive Parts Antitrust Litigation (In re Wire Harness Cases),* 2013 WL 2456612, at *8-*9 (E.D. Mich. June 6, 2013) ("*Wire Harnesses*"). In one of these decision, the Court explained that the defendant part suppliers had "cited no authority requiring an indirect purchaser to allege the detailed mechanics of the pass-through process to plead injury-in-fact and causation for purposes of constitutional standing to survive a Rule 12(b)(6) motion." *Wire Harnesses,* 2013 WL 2456612, at *8. GEICO's theory of causation, in its role as the owner of a fleet of vehicles, is fully

consonant with this Court's rulings on Article III standing in the multidistrict litigation, and there is no basis for a different outcome here.[3]

Nonetheless, Defendants contend that GEICO has insufficiently pleaded the "fairly traceable" element of Article III standing in those instances "where no one — much less GEICO — purchased an Auto Part."  (Defendants' Reply Br. at 5.) Specifically, Defendants cite the examples of claim payments (i) to insureds or third-party claimants who do not actually purchase replacement auto parts but instead pocket the payments, and (ii) made when vehicles are determined to be a total loss.  As Defendants recognize, this Court has not demanded detailed allegations regarding the mechanisms by which supra-competitive auto part prices are passed through to end purchasers of vehicles.  Yet, GEICO must establish a more elaborate pass-through mechanism here, under which the same allegedly anticompetitive activities that inflate the prices of new vehicles somehow result in higher claim payments for damaged or totaled vehicles.  In addition, GEICO potentially has the opportunity to offset these higher claim payments through such means as increased insurance premiums.  In Defendants' view, GEICO's complaint fails to address these complexities in the causal relationship between an alleged price-fixing conspiracy and resulting injury to GEICO as an insurer making claim payments.  Defendants further note that GEICO's claims of injury arising from reimbursement payments for totaled vehicles pose a risk of double recovery, given that the original purchasers of the vehicles already have an opportunity

---

[3]As noted earlier, to the extent that the allegations of GEICO's present complaint do not clearly set forth a theory of recovery based on GEICO's status as the owner of a fleet of vehicles, GEICO will have an opportunity to address this deficiency in the pleadings it files in response to the Court's rulings in this opinion and order.

to recover from the Defendant auto part suppliers in the multidistrict litigation for the increased cost of their vehicles due to Defendants' alleged price-fixing conspiracies.

These concerns are legitimate, and lead back to the question noted earlier: namely, whether GEICO's efforts to recover for direct part purchases, vehicle purchases as a fleet owner, and reimbursement payments as an insurer all constitute separate claims for which GEICO must establish its Article III standing, or instead reflect separate types of damages that GEICO seeks to recover through its overarching claims that Defendants engaged in price-fixing conspiracies. At a minimum, GEICO has pleaded the causal element of Article III standing as to at least some of its theories of recovery, and Defendants, as the moving parties, have not explained why more should be required at this juncture. Moreover, Defendants' challenge to GEICO's allegations of antitrust injury implicates similar issues of causation, and the Court finds that these questions are better addressed in that context. Accordingly, the Court concludes that GEICO has adequately alleged that its injuries are fairly traceable to Defendants' allegedly anticompetitive activities.

### D. GEICO Has Adequately Alleged Its Standing Under Antitrust Law to Seek Redress As a Fleet Owner and a Direct Purchaser of Defendants' Auto Parts, But Not As an Insurer.

Apart from adequately pleading the elements of Article III standing, GEICO also must establish antitrust standing — *i.e.,* that it is appropriately situated to obtain relief under federal and state antitrust law. Citing the multi-factor test adopted by the Supreme Court for determining whether a plaintiff has antitrust standing, *see Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 545, 103 S. Ct. 897, 912 (1983) (*"AGC"*), Defendants argue that GEICO's

antitrust claims are subject to dismissal because this insurer's alleged injuries are too remote from the alleged price-fixing schemes carried out by the Defendant auto part suppliers.

In response, GEICO first maintains that Defendants' challenge to its antitrust standing is foreclosed by this Court's rulings in the multidistrict litigation. To the extent that GEICO owns a fleet of vehicles and has reimbursed repair shops for their purchases of auto parts installed in the vehicles of GEICO's insureds and third-party claimants, GEICO argues that it is similarly situated to the EPPs in the multidistrict litigation that have withstood challenges to their antitrust standing. Moreover, GEICO points to its allegations of direct auto part purchases as demonstrating its antitrust standing. Finally, to the extent that GEICO participates in the insurance market, as opposed to the market for auto parts, it contends that these two markets are sufficiently intertwined to support a finding of antitrust standing with respect to GEICO's alleged injuries arising from its payment of insurance claims. As discussed below, the Court finds that GEICO has sufficiently pleaded its antitrust standing to pursue claims in its roles as fleet owner and direct purchaser of auto parts, but not in its capacity as an insurer making claim payments to its insureds or third-party claimants.

The Sixth Circuit has emphasized that "antitrust standing and Article III standing are not one and the same," and that a claim is subject to dismissal under Rule 12(b)(6) when the former is lacking. *NicSand, Inc. v. 3M Co.,* 507 F.3d 442, 449 (6th Cir. 2007). To establish the requisite antitrust standing, a plaintiff cannot rely solely upon "allegations of consequential harm resulting from a violation of the antitrust laws," because "Congress did not intend to allow every person tangentially affected by an

27

antitrust violation to maintain an action to recover threefold damages for the injury to his business or property." *AGC,* 459 U.S. at 535, 545, 103 S. Ct. at 907, 912 (internal quotation marks and citation omitted). Rather, even when a plaintiff alleges an antitrust violation and resulting harm, his claim may not go forward if "[o]ther relevant factors — the nature of the [plaintiff's] injury, the tenuous and speculative character of the relationship between the alleged antitrust violation and the [plaintiff's] alleged injury, the potential for duplicative recovery or complex apportionment of damages, and the existence of more direct victims of the alleged conspiracy — weigh heavily against judicial enforcement of the [plaintiff's] antitrust claim." *AGC,* 459 U.S. at 545, 103 S. Ct. at 912.

"[A]ntitrust standing is a threshold, pleading-stage inquiry[,] and when a complaint by its terms fails to establish this requirement[,] [the court] must dismiss it as a matter of law." *NicSand,* 507 F.3d at 450. Yet, the *AGC* factors "are to be balanced," and "no single factor is conclusive." *Bodie-Rickett & Associates v. Mars, Inc.,* 957 F.2d 287, 290 (6th Cir. 1992); *see also Fuel Senders,* 29 F. Supp.3d at 1001. Although *AGC* by its terms applies only to claims under federal antitrust law, Defendants state without contradiction that the same or similar principles of antitrust standing govern the state law antitrust claims asserted in GEICO's complaint. *See Fuel Senders,* 29 F. Supp.3d at 1002 (recognizing that the jurisdictions under which the plaintiffs in that case brought state law antitrust claims "either apply the *AGC* factors, look to federal law to interpret their state statutes, or apply a similar remoteness analysis to state antitrust claims").

In determining whether GEICO has antitrust standing, the Court must distinguish among the types of injuries alleged in GEICO's complaint and elsewhere in the record.

28

First, GEICO alleges that it has directly purchased relevant auto parts, (*see, e.g.,* SAC at ¶¶ 17-25, 165), although the complaint does not provide any details as to the circumstances in which these purchases have occurred.  Next, GEICO states — albeit in its response to Defendants' motion, and not in its complaint — that it is an indirect purchaser of relevant auto parts by virtue of its ownership of a fleet of vehicles.  Finally, GEICO identifies three types of payments it has made in its role as an insurer:  (i) payments to auto repair professionals on behalf of insureds and third-party claimants for replacement auto parts installed by the repair shop (referred to by Defendants as "Repair Payments"); (ii) reimbursement payments to insureds or third-party claimants to settle automotive damage or repair claims that potentially involved the purchase and installation of replacement auto parts ("Reimbursement Payments"); and (iii) payments to insureds or third-party claimants for the full value of vehicles declared a total loss ("Total Loss Payments").  (*See, e.g.,* SAC at ¶ 49.)

Turning first to the injuries allegedly suffered by GEICO that did not arise from the payment of insurance claims, it is clear that GEICO has standing to pursue antitrust claims arising from these injuries.  To the extent that GEICO itself has purchased relevant auto parts at supra-competitive prices, this direct link between Defendants' alleged antitrust violations and resulting harm to GEICO obviates the need for consideration of the *AGC* factors.  *See, e.g., In re Cardizem CD Antitrust Litigation,* 332 F.3d 896, 911 (6th Cir. 2003) (holding that the alleged injury of "paying higher prices for a product due to a lack of competition in the market" is sufficient to establish antitrust standing).  As for the injuries allegedly sustained by GEICO as the owner of a fleet of vehicles, GEICO contends that this alleged harm is precisely the same as the injury

claimed by the EPPs in the multidistrict litigation, who likewise are indirect purchasers of auto parts that were installed either (i) in new vehicles purchased by the EPPs, or (ii) in the process of repairing damaged vehicles owned by the EPPs.  *See, e.g., Fuel Senders,* 29 F. Supp.3d at 992-93.  As GEICO observes, this Court has held in the multidistrict litigation that EPPs satisfy the *AGC* standard for antitrust standing, *see, e.g., Fuel Senders,* 29 F. Supp.3d at 1001-03; *Wire Harnesses,* 2013 WL 2456612, at *14-*18, and Defendants fail to suggest why the outcome should be different here.

Matters are more complicated, however, when considering the injuries allegedly sustained by GEICO in its role as auto insurer.  In particular, the *AGC* factors must be separately analyzed for each type of payment GEICO has made in this capacity.  The Court addresses in turn each of the forms of payment made by GEICO as an insurer.

### 1. Repair Payments

In the case of Repair Payments, GEICO reimburses a repair professional for the cost of replacement auto parts installed in the course of repairing an insured's or third-party claimant's vehicle. In this instance — unlike the other types of payments made by GEICO as an auto insurer — Defendants have no cause for concern that GEICO's payment might have been wholly unrelated to the purchase of auto parts, such that this transaction should be characterized as occurring outside the auto parts market in which Defendants allegedly carried out their price-fixing conspiracies. Rather, the principal *AGC* factors implicated by GEICO's Repair Payments are the risk of duplicative recovery and the existence of more direct victims of Defendants' alleged antitrust violations. Accordingly, the Court focuses primarily on these two factors in determining whether GEICO has sustained an antitrust injury as a result of its Repair Payments.

In Defendants' view, "[t]he risk of duplicative recovery weighs heavily against standing here." (Defendants' Motion, Br. in Support at 14 (footnote omitted).) In particular, Defendants point to the EPPs in the multidistrict litigation as more direct victims of the alleged price-fixing conspiracies who have "already asserted . . . and settled" claims against the Defendant auto part suppliers, and thereby "vindicated the public interest" that might otherwise be served through GEICO's purportedly less direct effort to recoup its Repair Payments. (*Id.* at 15 (internal quotation marks omitted).) Indeed, Defendants go further in their reply brief, submitting that GEICO "seeks recovery for the same transaction — the *same* Auto Parts installed in the *same* vehicles — as the end-payors." (Defendants' Reply Br. at 7 (emphasis in original).) In light of this purported "certainty" that "a more directly affected plaintiff" may challenge — and, in

31

Defendants' view, has challenged — the price-fixing conspiracies alleged by GEICO, Defendants assert that the relevant *AGC* factors "could not weigh more heavily against antitrust standing."  (Defendants' Motion, Br. in Support at 15.)

In response, GEICO does not deny that its claims arising from Repair Payments pose a risk of duplicative recovery.  Instead, it more broadly contends that "duplicative recovery is not a properly considered *AGC* factor in this case," (Plaintiffs' Response Br. at 16), where it has asserted antitrust claims under the laws of jurisdictions that have enacted so-called "*Illinois Brick* repealer statutes" — that is, statutes that override the Supreme Court's decision in *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S. Ct. 2061 (1977), and allow recovery by indirect purchasers under state law.  In support of this sweeping invitation to disregard the possibility of duplicative recovery, GEICO points to this Court's decision in *Wire Harnesses,* 2013 WL 2456612, at *18, as well as another district court ruling, *In re Flash Memory Antitrust Litigation,* 643 F. Supp.2d 1133, 1156 (N.D. Cal. 2009), that this Court has cited with approval in the multidistrict litigation.

To be sure, this Court has recognized that a state's enactment of an *Illinois Brick* repealer statute evidences a state policy to "allow indirect purchasers to bring [antitrust] claims" despite a heightened risk of duplicative recovery.  *Fuel Senders,* 29 F. Supp.2d at 1003; *see also Wire Harnesses,* 2013 WL 2456612, at *18.  Yet, the Court has not gone so far as to say that these enactments render the threat of duplicative recovery wholly irrelevant to an antitrust standing inquiry under *AGC.*  To the contrary, rather than relying solely on a state's repeal of *Illinois Brick* as conclusively resolving *AGC*'s "duplicative recovery" factor in favor of an indirect purchaser's antitrust standing, this Court has gone on to cite specific allegations by the indirect purchaser that "lessen the

risk of duplicative recovery." *Wire Harnesses,* 2013 WL 2456612, at *18 (citing *In re Flash Memory,* 643 F. Supp.2d at 1156); *see also Fuel Senders,* 29 F. Supp.3d at 1003. In its *Fuel Senders* decision, for example, the Court pointed to the indirect purchasers' allegations that the overcharges they paid were "distinct and traceable," and it further observed that the direct purchaser OEMs were not pursuing their own antitrust claims. 29 F. Supp.3d at 1003; *see also Wire Harnesses,* 2013 WL 2456612, at *18 (citing similar allegations of "distinct and traceable" overcharges as "lessen[ing] the risk of duplicative recovery").

Here, in contrast, Defendants state without contradiction that duplicative recovery is not only a possibility but a certainty, where the settlements reached in the multidistrict litigation between the defendant auto parts suppliers and the EPPs define the settlement classes as including indirect purchasers of replacement auto parts.  (*See* Defendants' Motion, Ex. B-2 (chart of relevant settlement agreement provisions).)[4] Thus, the repair professionals who are reimbursed through Repair Payments evidently are eligible to recover in the multidistrict litigation as part of the EPP settlement classes. Moreover, although the *Illinois Brick* repealer statutes reflect a policy that indirect purchasers should be permitted to bring claims even at the risk of duplicative recovery by direct purchasers, Defendants correctly observe that GEICO's Repair Payment claims "seek[] recovery for the same transaction[s] — the *same* Auto Parts installed in

---

[4]In some more recent cases, the proposed classes do not include indirect purchasers of replacement parts, but only those individuals or entities who have purchased or leased new vehicles.  (*See, e.g., Ascher v. Alpha Corp.,* No. 16-13997, Dkt. 1, Complaint at ¶¶ 143-44 (part of the Access Mechanisms Actions, No. 16-04103).)  The EPP settlements identified by Defendants, however, encompass these indirect purchases of replacement parts.

the *same* vehicles" — that the indirect purchaser repair professionals rely upon to obtain reimbursement through the Repair Payments. (Defendants' Reply Br. at 7 (emphasis in original).) Under these circumstances, two of the *AGC* factors — the risk of duplicative recovery and the existence of more direct victims — weigh heavily against GEICO's antitrust standing.

The remaining *AGC* factors do not tip the balance in GEICO's favor with respect to its Repair Payment claims. First, regarding "the nature of [GEICO's] alleged injury[,] including the status of [GEICO] as consumer or competitor in the relevant market," *Southaven Land Co. v. Malone & Hyde, Inc.,* 715 F.2d 1079, 1085 (6th Cir. 1983), all are agreed that the injuries allegedly incurred by GEICO as a result of its Repair Payments were not a product of GEICO's participation in the markets for the various auto parts at issue here. Rather, GEICO made the Repair Payments to reimburse repair professionals, who in turn were indirect purchasers of the relevant auto parts that were the subject of Defendants' alleged price-fixing conspiracies. Nonetheless, GEICO correctly observes that it need not be a direct participant in the relevant auto part markets, so long as the market in which it did participate is "inextricably linked and intertwined" with these markets. *Fuel Senders,* 29 F. Supp.3d at 1002.

The allegations of GEICO's complaint fail to forge this link. Admittedly, GEICO has affirmatively alleged that "[t]he individual Auto Parts Submarkets and the market for vehicles are inextricably linked and intertwined," (SAC at ¶ 166), and this Court has deemed such an allegation sufficient to establish the antitrust standing of indirect purchasers in the multidistrict litigation, *see, e.g., Fuel Senders,* 29 F. Supp.3d at 1002; *Wire Harnesses,* 2013 WL 2456612, at *15-*16. These rulings are unavailing here,

34

however, because GEICO has not explained how its Repair Payments could be characterized as made in "the market for vehicles" or some other market that has been recognized as inextricably intertwined with the auto part markets in which Defendants carried out their alleged price-fixing conspiracies. Rather, GEICO makes Repair Payments in its role as an auto insurer, and although GEICO insists that "this [insurance] market too is inextricably intertwined with the market[s] for Auto Parts," (Plaintiffs' Response Br. at 17), Defendants aptly observe that GEICO has neither pleaded any such connection in its complaint nor cited any authority recognizing such a link between a product market and an insurer of participants in that market. *Cf. Southaven Land Co.,* 715 F.2d at 1086 (explaining that a plaintiff's injury is "inextricably intertwined" with the injury allegedly inflicted by an antitrust defendant on participants in the relevant market if the plaintiff is "manipulated or utilized by [the defendant] as a fulcrum, conduit or market force to injure" the participants in that market).

To the contrary, Defendants have pointed to case law that casts doubt on GEICO's effort to forge a sufficiently close connection between its Repair Payments and the pertinent auto part markets. In *Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris Inc.,* 185 F.3d 957 (9th Cir. 1999), for example, the plaintiff health and welfare benefit plans brought suit against tobacco companies, asserting claims under federal and state Racketeer Influenced and Corrupt Organizations ("RICO") and antitrust laws for costs incurred in paying for treatment of smoking-related illnesses suffered by plan participants and beneficiaries. Applying the *AGC* factors, as well as similar considerations governing RICO standing, the court held that the plaintiffs could not recover under either RICO or antitrust law. *Oregon Laborers-Employers,* 185 F.3d

35

at 966-67.  In support of this ruling, the court reasoned that the plaintiff benefit plans were "neither consumers nor competitors in the relevant market of cigarettes and tobacco products," and that "[t]o the extent they have suffered injury, their claims are entirely derivative of the injuries suffered by smokers."  185 F.3d at 967.  The court further explained that the plaintiffs' claimed injuries were too remote from the alleged wrongdoing of the defendant tobacco companies to permit a recovery under antitrust law, where absent "any injury to smokers, plaintiffs would not have incurred the additional expenses in paying for the medical expenses of those smokers."  185 F.3d at 963; *see also Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,* 191 F.3d 229, 239 (2d Cir. 1999) (holding in a similar case involving only RICO claims that the plaintiff health and welfare benefit funds lacked standing because their claimed injuries were "purely contingent on harm to third parties" and "their damages [we]re entirely derivative of the harm suffered by plan participants as a result of using tobacco products").

In an effort to distinguish this case law involving the tobacco industry, GEICO contends that it has alleged "direct" rather than indirect or derivative injuries by virtue of "paying inflated prices for Auto Parts."  (Plaintiffs' Response Br. at 16 n.13.)  Yet, in making Repair Payments, GEICO does not directly "pay[] inflated prices for Auto Parts," but instead reimburses indirect purchasers for the allegedly supra-competitive prices they paid to acquire those parts.  This is an indirect injury, purely derivative of the harm suffered by participants in the markets for auto parts.  To be sure, GEICO has alleged that this injury is directly traceable to the harm allegedly inflicted by Defendants on the markets for auto parts, but this consideration is relevant to another *AGC* factor,

36

discussed below.  The fact that GEICO's alleged injuries might be directly traceable to Defendants' alleged price-fixing conspiracies does not assist GEICO in showing either (i) that it sustained these injuries as a participant in the auto part markets in which Defendants allegedly conspired, or (ii) that these auto part markets were inextricably intertwined with the insurance market in which GEICO operated when making Repair Payments.  Accordingly, this *AGC* factor militates against a finding of antitrust standing.

The remaining *AGC* factors, in contrast, tend to support a finding of antitrust standing.  These factors call for consideration of "the causal connection between the violation and the harm," and "the directness of the injury, and whether damages are speculative." *Fuel Senders,* 29 F. Supp.2d at 1001.  Defendants posit a "complex" chain of distribution for auto parts and prices that are "affected by numerous market factors."  (Defendants' Motion, Br. in Support at 19; *see also id.* at 13-14 (diagrams representing these distribution chains).)  GEICO, on the other hand, alleges that the relevant auto parts are "identifiable, discrete physical products" that "may be traced through the chain of distribution," and that the "cost and price" of these parts "also may be traced."  (SAC at ¶ 167.)  The complaint further alleges that the supra-competitive prices charged by Defendants are passed along to repair professionals who obtain replacement parts in order to repair vehicles belonging to GEICO's insureds and third-party claimants, and that GEICO in turn is impacted by these supra-competitive prices when it reimburses these repair professionals for the artificially inflated costs they have incurred.  (*See id.* at ¶¶ 164-65.)  This Court has cited similar allegations of overcharges that are passed and traceable through the chain of distribution as sufficient to satisfy the pertinent *AGC* factors.  *See, e.g., Wire Harnesses,* 2013 WL 2456612, at *17.  Though

GEICO's claims admittedly add one more link to this chain of alleged overcharges, the Repair Payments theory of recovery does not inject an insurmountable degree of uncertainty or speculation into the task of tracing overcharges and resulting injuries through the distribution chain, particularly in the pleading stage of this litigation.

Upon balancing these various *AGC* factors, the Court concludes that GEICO lacks antitrust standing to pursue its claims arising from Repair Payments. Most notably, GEICO's recovery under this theory would be entirely duplicative of the recoveries obtained by EPPs in their settlements with Defendants in the multidistrict litigation. Moreover, these indirect purchasers of relevant auto parts are better positioned than GEICO to vindicate the public interest in holding Defendants accountable for their alleged price-fixing conspiracies. In addition, GEICO has failed to plead facts from which it could be concluded that the insurance market in which GEICO sustained its injuries is inextricably intertwined with the auto part markets in which Defendants carried out their alleged conspiracies. Although other factors tend to support a finding of antitrust standing, these considerations tip the balance decisively in the other direction.

### 2. Reimbursement Payments

The next type of injury identified by GEICO as supporting a recovery under antitrust law is its Reimbursement Payments — that is, payments made to insureds or third-party claimants to settle automotive damage or repair claims that potentially entail the purchase and installation of replacement auto parts. Much of the preceding analysis addressing GEICO's Repair Payments applies with equal force here, so the Court may proceed more quickly through its consideration of the *AGC* factors.

First, to the extent that GEICO's Reimbursement Payments cover the cost of replacement auto parts used in the process of repairing an insured's or third-party claimant's vehicle, these payments are materially indistinguishable from GEICO's Repair Payments in terms of the risk of duplicative recovery and the existence of more direct victims of Defendants' alleged price-fixing conspiracies. In either case, an indirect purchaser obtains replacement auto parts for use in vehicle repair, and GEICO in turn makes an insurance payment that covers the cost of this indirect purchase. Accordingly, the Court's earlier assessment of Repair Payments applies here as well: duplicative recovery is not only a possibility but a near certainty, given the settlements reached in the multidistrict litigation between the Defendant auto part suppliers and the indirect purchasers, and the definition of the settlement classes as including indirect purchasers of replacement auto parts.[5] Likewise, these indirect purchasers are more

_____

[5]In its response to Defendants' motion, GEICO suggests that Defendants' protest against duplicative recovery should be viewed as "a case of buyers' remorse," where Defendants agreed to settlement classes in the multidistrict litigation that "included automobile insurers" among the indirect purchasers of replacement parts, but then failed to negotiate settlement terms that accounted for the situations in which "automobile insurers [we]re the party paying for" these replacement parts. (Plaintiffs'

direct victims of Defendants' alleged antitrust violations, and they have already challenged this alleged wrongdoing and obtained relief through the settlements in the multidistrict litigation.

Next, it is clear that GEICO makes both Repair and Reimbursement Payments in its role as insurer, and not as a participant in the pertinent markets for auto parts. Consequently, the Court's analysis of the *AGC* factor concerning the nature of GEICO's alleged injury applies with equal force to both Repair and Reimbursement Payments. In short, just as with the Repair Payments, three of the *AGC* factors weigh strongly against a finding of antitrust standing.

However, the comparison between Repair and Reimbursement Payments breaks down in situations where the latter are not, in fact, used to cover the cost of purchasing replacement auto parts. As Defendants observe, the recipient of a Reimbursement Payment will not necessarily use this payment to purchase replacement parts, but instead might elect to forgo repairs and pocket the insurance proceeds. In these

_____

Response Br. at 20 n.16.)  In GEICO's view, "[b]ecause automobile insurers pay for the vast majority of replacement parts in the United States," Defendants' negotiation of settlement agreements that frequently result in payments to two parties arising from a single purchase of replacement parts reflects a missed opportunity to craft settlement classes that account for this marketplace reality.  (*Id.*)

As Defendants observe, however, any such potential for duplicative recoveries among members of the settlement classes in the multidistrict litigation is unhelpful to GEICO in establishing antitrust standing in this case.  Rather, GEICO must show that the *AGC* factors, including the risk of duplicative recovery, favor a finding of antitrust standing under the circumstances presented here, and it is wholly immaterial that insurers who are similarly situated to GEICO have been included in settlement classes in the multidistrict litigation without having to make this showing.  GEICO could have obtained this benefit by participating in the settlements, but it instead elected to opt out and pursue its own claims.

circumstances, two of the *AGC* factors no longer militate against standing, because the absence of a part purchase means that there is neither a risk of duplicative recovery nor a more direct victim who is better positioned to challenge Defendants' alleged antitrust violations. Yet, any advantage to GEICO under these two factors is more than offset by other considerations. After all, if a Reimbursement Payment is not used to cover the cost of replacement parts, it cannot possibly be viewed as made in either the market for auto parts or any other market that is inextricably intertwined with this market. GEICO has not cited any authority for treating such payments in a wholly separate market as antitrust injuries. *Cf. Southaven Land Co.,* 715 F.2d at 1086-87 (finding that an injury that was only a "tangential by-product" of the defendant's allegedly anticompetitive conduct was "not sufficiently linked to the pro-competitive policy of the antitrust laws" to confer antitrust standing). It follows that the *AGC* factor addressing the nature of GEICO's alleged injury tilts the balance decisively against a finding of antitrust standing in instances where a Reimbursement Payment is not associated with the purchase of a relevant auto part.

As for the remaining *AGC* factors — the causal connection between the violation and the harm, and the directness of the injury and the related question whether damages are speculative — they are no more favorable to a claim of antitrust standing derived from Reimbursement Payments than from Repair Payments, and arguably less so under some circumstances. To the extent that a Reimbursement Payment compensates for the purchase of auto parts, GEICO has alleged (i) that both the parts and their costs may be traced through the chain of distribution, and (ii) that the supra-competitive prices charged by Defendants for these parts were passed along to GEICO

41

by its insureds, third-party claimants, or the repair professionals that obtained and installed these parts.  (*See* SAC at ¶¶ 164-65, 167.)  As discussed earlier, similar allegations were deemed sufficient in the multidistrict litigation to establish the antitrust standing of indirect purchasers, *see, e.g. Wire Harnesses,* 2013 WL 2456612 at *17, and the Court has explained that GEICO's Repair Payment claims do not add so much complexity to the pass-through of overcharges that they should tip the balance of the relevant *AGC* factors against standing.  It follows, then, that the Court's reasoning with respect to GEICO's Repair Payments should likewise govern the analysis of GEICO's Reimbursement Payments, at least insofar as these two types of payments reflect similar reimbursements to indirect purchasers for the cost of obtaining auto parts at allegedly supra-competitive prices.

The same cannot be said for the situation in which no parts are purchased in connection with a Reimbursement Payment.  Even assuming that the claim payments made by GEICO in these circumstances bear some relationship to the allegedly supra-competitive prices of auto parts that would have to be acquired if the insured's or third-party claimant's vehicle were actually repaired, Defendants correctly observe that GEICO's complaint is wholly silent as to the claim adjustment process used by GEICO to determine the amounts of these payments.  Thus, the Court is left to speculate on such relevant matters as (i) whether insureds and third-party claimants are reimbursed for the full amount they would have paid for the replacement parts necessary to repair their vehicles, and (ii) whether GEICO's agreements with its insureds invariably provide for this full reimbursement or instead apply different claim adjustment schemes and formulas that depend upon the insured's choice of a particular policy or type of

coverage.  As Defendants aptly summarize, GEICO's Reimbursement Payments are "a further step removed from the market[s] in which Defendants participated," (Defendants' Reply Br. at 12), which injects additional uncertainty into the analysis of the *AGC* factors that call for consideration of (i) the causal connection between Defendants' alleged antitrust violations and harm to GEICO, and (ii) the directness of GEICO's injury and speculative nature of the resulting harm.  In light of the Court's conclusion that GEICO's allegations are insufficient to establish its antitrust standing to pursue its Repair Payment claims, these same allegations necessarily fail to overcome the additional obstacles that stand in the way of GEICO's effort to recover its Reimbursement Payments under antitrust law.

### 3.  Total Loss Payments

The final type of injury for which GEICO seeks to recover is its Total Loss Payments — *i.e.,* payments made to insureds or third-party claimants for vehicles declared a total loss.  Again, the analysis of the *AGC* factors with respect to GEICO's Total Loss Payments does not differ considerably from the analysis of GEICO's other claims arising from its payments as an insurer.  Indeed, because the injuries arising from GEICO's Total Loss Payments are materially indistinguishable from the injuries sustained by this insurer as a result of Reimbursement Payments where no auto parts are purchased, the Court travels no new ground in addressing GEICO's antitrust standing to recover its Total Loss Payments.

First, because GEICO's Total Loss Payments do not reimburse their recipients for any purchase of replacement auto parts, there is neither a risk of duplicative recovery nor a more direct victim who is better situated to challenge the alleged antitrust

violations that led to GEICO's injuries.  Accordingly, as is the case with Reimbursement Payments where no auto parts are purchased, these two *AGC* factors favor a finding of antitrust standing for GEICO's claims arising from Total Loss Payments.

The remaining *AGC* factors, however, tip the balance decisively against a finding of antitrust standing.  First, because Total Loss Payments are not made in connection with the purchase of auto parts, the injury allegedly inflicted on GEICO does not occur in the auto part markets in which Defendants allegedly conspired.  As already discussed in the context of Reimbursement Payments that do not cover the cost of replacement parts, GEICO has not put forward any allegations or authority to support a finding that the insurance market in which Total Loss Payments are made is inextricably linked with the market for auto parts.

The final two *AGC* factors — the causal connection between the violation and the harm, and directness of the injury and the related question whether the resulting damages are speculative — also militate against a finding of antitrust standing. GEICO's apparent theory of harm with respect to Total Loss Payments is that these payments, like the prices paid for new vehicles, are inflated by virtue of Defendants' overcharges for the component parts of the vehicles.  As observed earlier, however, GEICO has not described its claim adjustment process for determining the amount of Total Loss Payments, much less alleged that Defendants' alleged overcharges somehow affect this process in a predictable manner and produce increased payments that can be traced to Defendants' overcharges and quantified in order to arrive at a non-speculative award of damages.  Rather, the complaint addresses this subject at only the highest level of generality, inviting the Court to assume (i) that the supra-competitive

44

prices allegedly charged by Defendants somehow pass into the insurance market and produce increased Total Loss Payments, (ii) that the extent of these increases can be accurately measured and properly apportioned among the Defendant auto part suppliers, and (iii) that any such means of measuring and apportioning damages will be equally valid across the various forms of auto insurance coverage offered by GEICO.

Indeed, Defendants correctly point out that GEICO's effort to recover for its Total Loss Payments introduces still more levels of uncertainty into the process of attributing fault to particular Defendant suppliers and quantifying the resulting harm to GEICO.  As Defendants observe, GEICO "fails entirely to allege how insureds or claimants came to possess" the vehicles for which Total Loss Payments are made, leading to the possibility that some of these vehicles might have "passed through multiple, intervening, used vehicle transactions — including private sales transactions, dealer trade-ins, and non-arm's-length transactions like gifts from family members — on the path from the OEMs to the insureds."  (Defendants' Motion, Br. in Support at 22.)  Even assuming that GEICO could provide a reasonable measure of harm resulting from a Total Loss Payment for a vehicle purchased as new by an insured, GEICO does not limit its attempted recovery to only this subclass of Total Loss Payments, nor does its complaint attempt to address, or even acknowledge, the myriad complicating factors that must be considered when Total Loss Payments are made for used vehicles.  Accordingly, GEICO lacks standing to assert antitrust claims arising from this type of payment.

**E.    To the Extent That GEICO Seeks to Recover from Defendants Under a Theory of Subrogation, the Court Cannot Determine the Viability of This Potential Avenue of Recovery Under the Present Record.**

To the extent that GEICO seeks to recover in this case as an insurer, rather than a direct purchaser of auto parts or the owner of a fleet of vehicles, Defendants argue that any such claims have been settled and released under the terms of the settlement agreements entered into by the EPPs and the defendant auto parts suppliers in the multidistrict litigation.  Specifically, Defendants point to provisions in these settlements in which the EPPs (i) broadly released all claims they could bring against the defendant suppliers arising from the conduct alleged in the multidistrict litigation, and (ii) agreed that these releases encompassed not only any claims that the EPPs themselves had brought or could have pursued, but also any claims that could be asserted derivatively on their behalf.  (*See* Defendants' Motion, Ex. B-2, Index of Relevant Settlement Agreement Provisions in Multidistrict Litigation.)  Indeed, most of these settlement agreements expressly included "insurers" in the list of non-parties whose derivative claims were released by the members of the EPP settlement classes.  Defendants further observe that GEICO plainly had notice of these settlements, given its election to opt out of the settlement classes, but that it nonetheless failed to lodge any objections to the releases or any other terms of these agreements.  It follows, in Defendants' view, that any claims asserted by GEICO in this case in its role as insurer have been released by GEICO's insureds as members of the EPP settlement classes.

In response, GEICO first insists — and Defendants do not dispute — that Defendants' appeal to the releases in the EPP settlement agreements has no effect on GEICO's ability to pursue recoveries based on (i) its direct purchases of relevant auto parts, or (ii) its purchase and ownership of a fleet of vehicles.  In these capacities, GEICO is properly characterized as an EPP.  Because it opted out of the settlements

46

reached by the EPPs in the multidistrict litigation, it preserved its right to independently assert claims of the sort advanced, and then settled and released, by the EPPs — namely, claims of injury to vehicle and replacement part purchasers resulting from Defendants' alleged price-fixing conspiracies.  Although Defendants challenge these claims on other grounds, they do not contend that the releases granted to them in the multidistrict litigation operate to bar GEICO from seeking to recover in its roles as automobile and auto part purchaser.  Rather, the parties disagree only as to the viability of GEICO's claims in its capacity as insurer.

Despite their differences as to the merits of GEICO's claims as insurer, the parties seemingly agree that these claims — and, more specifically, the possible release of these claims via the EPP settlement agreements — are properly analyzed under the law governing an insurer's right of subrogation.  As explained by the Sixth Circuit, the doctrine of equitable subrogation, "as applied in the insurance context, allows an insurer to sue a third party for injuries that the third party caused to the insured, when the insurer compensated the insured for those injuries."  *National Surety Corp. v. Hartford Casualty Insurance Co.,* 493 F.3d 752, 756 (6th Cir. 2007).  Although this theory of recovery is governed by state law and an insurer's right of subrogation therefore varies from state to state, the parties agree upon the general contours of the law of subrogation as it applies here.  In particular, "[t]he doctrine of equitable subrogation allows insurers to 'stand in the shoes' of their insured to seek indemnification by pursuing any claims that the insured may have had against third parties legally responsible for the loss."  *Allstate Insurance Co. v. Mazzola,* 175 F.3d 255, 258 (2d Cir. 1999).  In pursuing this recovery, the insurer (or subrogee) "succeeds

47

to the rights of" its insured (the subrogor), and seeks to "require the party who caused the damage to reimburse the insurer for the payment the insurer has made" to its insured. *Allstate,* 175 F.3d at 258 (internal quotation marks and citations omitted).

"As a general matter, a subrogation claim by an insurer depends upon the claim of the insured and is subject to whatever defenses the tortfeasor has against the insured." *Allstate,* 175 F.3d at 260 (internal quotation marks and citations omitted). Thus, "[w]hen an insured settles with or releases a third party from liability for a loss that the third party has caused, the insurer's subrogation right against such party may be destroyed." *Gibbs v. Hawaiian Eugenia Corp.,* 966 F.2d 101, 106 (2d Cir. 1992). There is an exception to this general rule. "Where a third party obtains a release from an insured with knowledge that the latter has already received payment from the insurer or with information that, reasonably pursued, should give him knowledge of the existence of the insurer's subrogation rights, such a release does not bar the [insurer's] right of subrogation." *Gibbs,* 966 F.2d at 107. This exception is intended to prevent a release from "operat[ing] as a fraud upon the insurer." *Allstate,* 175 F.3d at 261.

As discussed, the law of subrogation is relevant here only with respect to GEICO's claims arising from payments to its insureds or third-party claimants. GEICO does not dispute that under the terms of the settlements reached with the defendant auto part suppliers in the multidistrict litigation, the EPPs (i) broadly agreed to release the defendants from liability for any claims the EPPs brought or could have pursued relating to the conduct alleged in their complaints, and (ii) defined this release as encompassing not just the EPPs themselves, but also any third party that could assert the EPPs' claims derivatively. (*See id.*) Indeed, Defendants note that nearly all of the

48

settlement agreements expressly listed insurers as among the third parties whose claims were released. Moreover, there is no dispute that GEICO was aware of the terms of the EPP settlements, given its express election to opt out of the settlement classes, but it did not lodge any objections to any aspect of these settlements.

It follows, in Defendants' view, that GEICO's claims in the present suit are barred to the extent that they arise from GEICO's role as insurer and seek to recover for payments made to insureds or third parties as reimbursement for the purchase of auto parts at supra-competitive prices. As Defendants observe, these insureds and third-party claimants "are members of the EPP settlement classes," (Defendants' Motion, Br. in Support at 24), and they therefore have settled and released their claims against Defendants arising from the auto part purchases covered by the settlements. Moreover, these releases encompass not only the claims that were brought or could have been brought by the EPPs themselves, but also claims asserted derivatively by third parties such as GEICO that rest upon the same underlying auto part transactions. Accordingly, Defendants maintain that any claims asserted by GEICO as an insurer, regardless of the underlying legal theory of recovery, have been released as a result of the EPPs' settlements in the multidistrict litigation.[6]

As Defendants recognize, however, the doctrine of subrogation arguably provides an avenue for GEICO to avoid this result, assuming it can identify a viable

---

[6]Of course, to the extent that the Court has determined elsewhere in this opinion and order that GEICO's claims as an insurer are defeated on other grounds, it need not decide whether these claims were released under the EPP settlements. This includes, most notably, GEICO's claims under antitrust law resting upon repair, replacement, and total loss payments made pursuant to GEICO's policies with its insureds.

basis for such a recovery here.  Under this theory, GEICO "succeeds to the rights of" its insureds in order to "require [Defendants] to reimburse [GEICO] for the payment[s] [it] has made" to its insureds arising from the losses they sustained in purchasing auto parts at supra-competitive prices.  *Allstate,* 175 F.3d at 258 (internal quotation marks and citations omitted).  This "right of subrogation attaches, by operation of law, upon [GEICO's] payment of an insured's loss," *Allstate,* 175 F.3d at 260, and it is precisely these claim payments that GEICO seeks to recover from Defendants through the various claims it has asserted in its role as insurer.

As observed earlier, a subrogation claim brought by GEICO as insurer "depends upon the claim of [its] insured and is subject to whatever defenses the tortfeasor has against the insured."  *Allstate,* 175 F.3d at 260 (internal quotation marks and citations omitted).  Ordinarily, then, once an insured "settles with or releases a third party from liability for a loss that the third party has caused," the insurer's right of subrogation is extinguished.  *Gibbs,* 966 F.2d at 106.  Defendants contend that under this usual rule, the EPPs' settlements and releases in the multidistrict litigation preclude GEICO from pursuing claims of subrogation in this case, as these claims are subject to the same defense of release that would prevent the EPPs themselves from seeking any additional recovery from Defendants.  Defendants further point out that GEICO does not even purport to assert any claims of subrogation in its complaint.  This pleading deficiency is particularly acute, in Defendants' view, where GEICO's rights to subrogation "depend[] on the terms of its contracts with its insureds and the [state] law[s] governing those contracts," but where GEICO has failed to "allege[] any of the terms of its insurance contracts" or "any facts showing that it could meet the required elements for a

subrogation claim under the laws of any state." (Defendants' Motion, Br. in Support at 25-26.)

Yet, while the releases granted by the EPPs in their settlements ordinarily would operate to defeat GEICO's right of subrogation, this rule is subject to a recognized exception that arguably might apply here. Specifically, "[w]here a third party obtains a release from an insured with knowledge that the latter has already received payment from the insurer or with information that, reasonably pursued, should give him knowledge of the existence of the insurer's subrogation rights, such a release does not bar the [insurer's] right of subrogation." *Gibbs,* 966 F.2d at 107. In GEICO's view, Defendants cannot establish that they lacked knowledge or notice of GEICO's claim payments to its insureds and its resulting right of subrogation, particularly in light of "the nature of the [a]uto [p]arts business (in which insurance companies are intricately involved in paying for parts and labor to restore insureds' vehicles to pre-loss condition)." (Plaintiffs' Response Br. at 32.) Defendants, for their part, note the absence of any allegations in the complaint that GEICO "notified Defendants of any subrogation rights that may have accrued as a result of paying claims to the EPPs," and they further observe that GEICO has not "attempt[ed] to identify the EPPs whose claims might be subrogated, to notify the Defendants of the number or value of EPP claims that might be subrogated, or to put Defendants on notice that they were at risk of paying the EPP claims twice if the Settlement Agreements became effective." (Defendants' Motion, Br. in Support at 27.)

This dispute cannot be resolved in the context of the present Rule 12(b)(6) motion to dismiss. First, Defendants correctly observe that GEICO has not even

attempted to plead a theory of subrogation in its present complaint, and the Court cannot analyze the viability of this theory of recovery in a vacuum. Next, through their appeal to the release provisions in the EPP settlement agreements, Defendants have raised an affirmative defense to GEICO's claims as an insurer. *See* Fed. R. Civ. P. 8(c)(1) (identifying "release" as an affirmative defense that must be asserted in response to a complaint). As uniformly recognized in the case law, it generally is not appropriate to grant a Rule 12(b)(6) motion to dismiss on the basis of an affirmative defense, because a plaintiff ordinarily has no obligation to plead around this affirmative defense in order to state a viable claim. *See, e.g., Estate of Barney v. PNC Bank, N.A.,* 714 F.3d 920, 926 (6th Cir. 2013); *Cataldo v. U.S. Steel Corp.,* 676 F.3d 542, 547 (6th Cir. 2012); *see also Deckard v. General Motors Corp.,* 307 F.3d 556, 560 (7th Cir. 2002).

To be sure, a motion to dismiss may be granted where the "undisputed facts" as set forth in the pleadings "conclusively establish an affirmative defense as a matter of law." *Estate of Barney,* 714 F.3d at 926 (internal quotation marks and citations omitted). Here, however, the pleadings do not address, much less conclusively resolve, the factual question whether Defendants had knowledge or notice of GEICO's potential subrogation rights arising from its claim payments to EPPs, such that the releases granted by the EPPs to Defendants did not operate to extinguish these rights. Consequently, GEICO's ability to pursue its claimed right of subrogation — assuming that it intends to pursue such a theory of recovery, and that such a claim is properly asserted in the amended pleadings authorized elsewhere in this opinion and order — is not defeated at the present juncture by the affirmative defense of release.

**F.    The Timeliness of This Suit Turns upon Factual Issues That The Court Cannot Resolve in the Context of a Rule 12(b)(6) Motion to Dismiss.**

According to Defendants, GEICO's federal antitrust claims are governed by a four-year statute of limitations, and its state law antitrust claims "are subject to statutes of limitation ranging from two to four years."  (Defendants' Motion, Br. in Support at 30.) Similarly, GEICO's state law consumer protection and unjust enrichment claims are governed by statutes of limitation "ranging from three to six years."  (*Id.*)  Defendants contend that all of GEICO's federal and state law claims are time-barred under these statutes of limitation, where GEICO's claims purportedly accrued "at the very latest . . . in February 2010," when the DOJ and foreign investigative agencies announced raids and investigations of auto part manufacturers, yet GEICO did not bring this suit until more than six years later, in September of 2016.  (*Id.* at 30-32.)  Although Defendants acknowledge that GEICO has invoked various mechanisms — including state discovery rules, the doctrine of fraudulent concealment, class action tolling, and the continuing violation doctrine — in an effort to bring its claims within the applicable limitation periods, they argue that GEICO's allegations fail to support these various attempts to save its allegedly untimely filing.

In response, GEICO views the pertinent case law — including, most notably, this Court's rulings in the multidistrict litigation — as supporting its appeals to discovery rules, fraudulent concealment, and class action tolling to extend the deadline for timely commencement of this suit.  At a minimum, to the extent that Defendants offer speculation or cite extrinsic evidence that might cast doubt upon GEICO's allegations of timely filing, GEICO contends that such factual issues are not properly resolved in the

context of a Rule 12(b)(6) motion to dismiss. As discussed below, the Court finds that GEICO has the better of this argument.

Defendants' statute of limitations challenge is an affirmative defense that must be set forth in response to a complaint. *See* Fed. R. Civ. P. 8(c)(1). A plaintiff ordinarily need not plead around such affirmative defenses, and "a motion under Rule 12(b)(6), which considers only the allegations in the complaint, is generally an inappropriate vehicle for dismissing a claim based upon the statute of limitations." *Cataldo,* 676 F.3d at 547; *see also In re Automotive Parts Antitrust Litigation (In re Wire Harness Cases — Truck & Equipment Dealer Actions),* 2015 WL 10376960, at *3 (E.D. Mich. Dec. 30, 2015) (*"Wire Harnesses — Trucks").* Nonetheless, dismissal under Rule 12(b)(6) is appropriate where "the allegations in the complaint affirmatively show that the claim is time-barred," *Cataldo,* 676 F.3d at 547, and it is the plaintiff's burden in this instance to affirmatively "plead circumstances which would indicate why [the events giving rise to a claim] w[ere] not discovered earlier" or "why the statute [of limitations] should be tolled," *Auslender v. Energy Management Corp.,* 832 F.2d 354, 356 (6th Cir. 1987).

Both sides agree that a federal antitrust claim must be brought within four years after the claim accrues. *See In re Automotive Parts Antitrust Litigation (In re Occupant Safety Restraints),* 2015 WL 4272784, at *10 (E.D. Mich. Aug. 29, 2014) (*"Occupant Safety Restraints")* (citing 15 U.S.C. § 15b). In addition, GEICO's state law antitrust claims "are subject to statutes of limitation ranging from two to four years." (*See* Defendants' Motion, Br. in Support at 30 (citing authorities collected in Ex. C).) GEICO's state law "consumer protection claims are subject to statutes of limitation ranging from three to six years," and its equitable claims of unjust enrichment likewise

54

are subject to the same periods of limitation that govern its state law antitrust and consumer protection claims.  (*Id.*)  As GEICO observes, however, even where its state law consumer protection and unjust enrichment claims may be governed by the same statutes of limitation, these claims "may be subject to different accrual and tolling rules." (Plaintiffs' Response Br. at 25 n.23.)

As the starting point of their statute of limitations challenge, Defendants maintain that the statutes of limitation for GEICO's various claims "began to run, at the latest, in February 2010, which is when GEICO alleges both that Defendants engaged in the last overt act in furtherance of the alleged conspiracy and that it learned of investigations of suppliers of [a]uto [p]arts for antitrust violations."  (Defendants' Motion, Br. in Support at 28.)  Because "all of GEICO's claims are governed by limitations periods of six years or less," (*id.*), and because GEICO did not bring this suit until September of 2016, Defendants contend that GEICO's complaint is subject to dismissal in its entirety as untimely filed.  In response, GEICO asserts that the allegations of its complaint are sufficient to raise factual issues as to both the accrual of its claims and the availability of tolling, so that it would not be appropriate to resolve these questions of fact in the context of a Rule 12(b)(6) motion to dismiss.

Turning first to the matter of claim accrual, Defendants cite two sets of allegations in GEICO's complaint as purportedly demonstrating that GEICO's claims accrued in February of 2010 at the latest.  First, GEICO alleges that the DOJ and its law enforcement counterparts in Europe and Japan conducted "[p]arallel raids" in February of 2010 as "part of a coordinated international operation" to investigate suspected anticompetitive activities by auto part suppliers.  (SAC at ¶¶ 129-31.)  In connection with

these raids, the DOJ "issued a general statement that it was 'investigating the possibility

of anticompetitive cartel conduct of automotive electronic component suppliers' but

provided no further detail." (*Id.* at ¶ 131.)  Next, Defendants read GEICO's complaint as

alleging that "Defendants committed the last overt acts in furtherance of the alleged

conspiracy" in February of 2010.  (Defendants' Motion, Br. in Support at 31 (citing SAC

at ¶ 179).)

Neither of these allegations, properly construed in the context of the complaint as

a whole, demonstrates conclusively that GEICO's claims accrued by February of 2010

at the latest.  Regarding the February 2010 announcements by the DOJ and other law

enforcement authorities that they were investigating possible anticompetitive conduct by

auto part suppliers, this Court has found that the requisite inquiry notice that triggers

claim accrual is not established through the "availability of limited information in the

public domain" regarding a government investigation.  *In re Automotive Parts Antitrust*

*Litigation (In re Ceramic Substrates),* No. 16-03802, Dkt. 27, slip op. at 11-12 (E.D.

Mich. May 5, 2017) ("*Ceramic Substrates").*  As the Court explained in the multidistrict

litigation, although the government investigations into the suspected antitrust activities

of auto part suppliers garnered "substantial and widespread" publicity over time, the

initial February 2010 announcements identified only some auto part suppliers and a

small subset of the auto parts, markets, and alleged conspiratorial activities that have

since engendered the multiplicity of complaints filed in the multidistrict litigation.  *See*

*Wire Harnesses — Trucks,* 2015 WL 10376960, at *4-*5.  More generally, this Court

emphasized that "[t]he statute of limitations inquiry is not made in light of all the

connections that subsequently came to light," but rather must be confined to the information disclosed "at the time of the publicity" in question.  *Id.* at *6.

In addition, GEICO affirmatively alleges that it remained unaware of Defendants' alleged price-fixing conspiracies for a period of time after the DOJ's initial February 2010 announcement.  Specifically, GEICO alleges (i) that Defendants and their co-conspirators "met and communicated in secret and agreed to keep the facts about their collusive conduct from being discovered," (ii) that they "engaged in other surreptitious activity, including the use of code names and meeting at private residences or remote locations," (iii) that they "coordinated their pricing in a manner to avoid detection," and (iv) that due to these affirmative efforts to conceal price-fixing activities, GEICO lacked knowledge or inquiry notice "until the public announcements of the government investigation[s] into each Auto Part."  (SAC at ¶¶ 183-84.)  This Court has repeatedly held that similar allegations of active concealment were sufficient to support appeals to the doctrine of fraudulent concealment, and thereby defer the accrual of claims.  *See, e.g., Occupant Safety Restraints,* 2014 WL 4272784, at *10-*11; *In re Automotive Parts Antitrust Litigation (In re Fuel Senders),* 2014 WL 1746121, at *11 (E.D. Mich. April 30, 2014); *In re Automotive Parts Antitrust Litigation (In re Wire Harness Cases),* 2013 WL 2456584, at *12 (E.D. Mich. June 6, 2013).  Therefore, factual issues remain as to the significance of the DOJ's February 2010 announcement to the accrual of GEICO's claims.

Nonetheless, Defendants insist that there must be an ascertainable end date to GEICO's appeals to discovery rules and fraudulent concealment, and they point to the allegation in the complaint that "the statutes of limitations as to GEICO's claims did not

begin to run, at the earliest, until [the] DOJ publicly announced the investigation into each Auto Part." (SAC at ¶ 176.) Based on this allegation, Defendants have produced a chart summarizing their views as to which of GEICO's part-specific claims would be time-barred by a statute of limitations that began to run on the date of the public announcement of an investigation into a given auto part. (*See* Defendants' Reply, Exhibit A.) Yet, GEICO's invocation of discovery rules and the doctrine of fraudulent concealment cannot be addressed in isolation, without regard for its concurrent appeals to the continuing violation doctrine and class action tolling, both of which are discussed below. GEICO notes, for example, that although a Defendant supplier's sales of a specific auto part at supra-competitive prices "may have stopped when the Department of Justice made an announcement for that ***particular*** part," discovery might yet reveal that "some conspirators . . . did not exit the conspiracy immediately upon the DOJ announcement and continued to [sell this part at] illegally inflated prices." (Plaintiffs' Response Br. at 24 n.20 (emphasis in original).) Once again, then, factual issues preclude the Court from accepting Defendants' argument that the dates of the DOJ's public announcements should be viewed as hard-and-fast deadlines for the accrual of GEICO's claims.

As for Defendants' contention that GEICO has acknowledged the February 2010 accrual of its claims by alleging that "Defendants engaged in the last overt acts in furtherance of the alleged conspiracies in February 2010," (Defendants' Reply Br. at 18), this argument both misreads GEICO's complaint and misstates the law governing continuing violations. First, GEICO alleges that "Defendants committed their last overt acts in furtherance of the various conspiracies ***beginning*** in February of 2010," (SAC at

¶ 179 (emphasis added)), not that the last of the overt acts for **each and every one** of the sixteen alleged part-specific conspiracies occurred by February 2010 at the latest. Next, although Defendants suggest that GEICO "contradicts . . . controlling Sixth Circuit precedent" by asserting that "claims accrued with each sale of an Auto Part," (Defendant's Reply Br. at 20 n.22), GEICO points to controlling Supreme Court precedent that supports its appeal to the continuing violation doctrine.  Specifically, as an example of a "continuing violation," the Court cited a "price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years," explaining that "each sale to the plaintiff" qualifies as an "overt act that is part of the violation" and thereby "starts the statutory period running again."  *Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 189, 117 S. Ct. 1984, 1990 (1997) (internal quotation marks and citations omitted). The Sixth Circuit decisions cited by Defendants are not to the contrary, but merely emphasize that under the continuing violation doctrine, "an overt act by the defendant is required to restart the statute of limitations and the statute runs from the last overt act." *DXS, Inc. v. Siemens Medical Systems, Inc.,* 100 F.3d 462, 467 (6th Cir. 1996) (quoting *Peck v. General Motors Corp.,* 894 F.2d 844, 849 (6th Cir. 1990)).  Consistent with this case law, GEICO alleges that "Defendants committed an overt act in furtherance of the conspiracies each time they sold an Auto Part to an OEM," and that "[f]or each [such] overcharge . . . , a cause of action accrued, restarting the relevant statute of limitations." (SAC at ¶¶ 178-79.)  Accepting these allegations as true, the Court finds that GEICO's

claims continued to accrue after February of 2010, and it rejects Defendants' appeal to this date as the last viable point of accrual.[7]

Finally, Defendants challenge GEICO's attempt to invoke class action tolling as an additional means of avoiding the applicable statutes of limitation. As all parties here recognize, the commencement of a class action suit tolls the applicable statutes of limitation for all those who would have been members of the putative class but instead "elect[] to opt out of the class action [and] file individual claims." *Weston v. AmeriBank,* 265 F.3d 366, 368 (6th Cir. 2001). GEICO alleges in its complaint that it "was a putative member of the proposed classes" in each of the sixteen part-specific cases that were transferred into the multidistrict litigation before this Court. (SAC at ¶ 186.) It follows, in GEICO's view, that the running of the relevant statutes of limitation was "tolled from the filing of the[se] class [action] suits until GEICO opted out of the litigation on April 11, 2016." (*Id.*)

---

[7]As Defendants observe, although each overt act starts a new period of limitation for claims arising from this act, "the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitation period." *Klehr,* 521 U.S. at 189, 117 S. Ct. at 1990-91. Accordingly, Defendants argue that GEICO should not be permitted to recover "for acts (and damages) that are alleged to have occurred years outside any applicable limitations period," and they have provided a chart summarizing the purported cut-off dates for recoverable auto part purchases under the relevant statutes of limitation of various states that govern each of the state law theories of recovery asserted by GEICO. (*See* Defendants' Reply Br. at 20-21 (citing Defendants' Reply, Exhibit B).)

Plainly, however, GEICO cannot be expected at this juncture to identify and allege each individual auto part sale for which it seeks to recover, so this matter cannot be resolved in the context of a Rule 12(b)(6) motion. Moreover, it is possible, as already discussed, that the accrual of claims arising from earlier auto part sales might be deferred by resort to discovery rules or the doctrine of fraudulent concealment, and this again is not an issue that is amenable to resolution through a motion to dismiss.

Defendants argue that this blanket allegation of class membership and attendant tolling is inadequate on two grounds. First, Defendants point to GEICO's failure to identify any specific putative class in the multidistrict litigation, much less "explain how it was a member of that class." (Defendants' Motion, Br. in Support at 33.) Next, Defendants fault GEICO for failing to "allege which (if any) state law claims, covering which (if any) Auto Part and which (if any) of its Payments, were tolled and for how long those claims were tolled, let alone whether any tolling in fact was long enough to rescue any of its claims." (*Id.*) Defendants maintain that these gaps in GEICO's allegations are especially problematic in light of the evolving definitions of the indirect purchaser classes in the multidistrict litigation, where at least some of the EPP complaints defined the plaintiff classes as all persons and entities that indirectly purchased specified auto parts "for personal use and not for resale." *See, e.g., LaCava v. Delphi Automotive LLP,* No. 11-14399, Dkt. 1, Complaint at ¶ 75 (E.D. Mich. Oct. 5, 2011); *In re Automotive Parts Antitrust Litigation (In re Wire Harness Systems),* No. 12-103, Dkt. 132, Second Consolidated Amended Class Action Complaint at ¶ 177 (E.D. Mich. June 20, 2013). In Defendants' view, GEICO's claims arising from payments made to insureds or third-party claimants cannot plausibly be characterized as involving purchases of auto parts "for personal use and not for resale."

In response, GEICO first contends that it is enough that it was a putative member of the settlement classes certified by the Court in each of the settlements reached by the EPPs and the auto part suppliers in the multidistrict litigation. (*See* Plaintiffs' Response, App. A (chart listing the settlement class definitions for each of the sixteen part-specific settlements reached between EPPs and auto part suppliers).) Even

assuming that the initial complaints in some of these cases featured narrower definitions of the plaintiff classes, GEICO points to case law holding that class action tolling extends to members of the expanded class ultimately certified by the Court.  *See Genden v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 114 F.R.D. 48, 54 (S.D.N.Y. 1987); *see also Harris v. Union Electric Co.,* 787 F.2d 355, 361 n.2 (8th Cir. 1986) (finding that class action tolling extended to "those members who were subsequently added to the class as a result of the court's redefinition"); *Smith v. Pennington,* 352 F.3d 884, 894 (4th Cir. 2003) (similarly looking to a plaintiff's motion for class certification as supplying the operative definition for tolling purposes, even though this definition was "more narrow than is arguably dictated by [the plaintiff's] complaint").  Although Defendants attempt to distinguish *Genden* on the ground that the court's initial (and narrower) class certification ruling in that case was "conditional" and subject to later reevaluation, *see Genden,* 114 F.R.D. at 54, they fail to suggest why the same rule should not apply here, where no class at all had been certified, conditional or otherwise, prior to the settlement classes proposed by the parties (including Defendants here) and accepted by the Court.  Moreover, even accepting that *Genden* and the other above-cited cases are not directly on point, it bears emphasis that Defendants have cited no case in which a court has declined to apply class action tolling to the members of a broader settlement class, and instead limited this tolling to a narrower class as defined in the plaintiff's initial complaint.

As for Defendants' protest that GEICO's complaint lacks specificity as to precisely which of the complaints or settlement classes in the multidistrict litigation operated to "toll[] which of [GEICO's] claims over what period of time," (Defendants'

Reply Br. at 18-19), GEICO points in response to the rule, cited earlier, that a plaintiff generally need not plead facts in avoidance of a statute of limitations defense.  *See Bishop v. Lucent Technologies, Inc.,* 520 F.3d 516, 520 (6th Cir. 2008).  Although it is true that a plaintiff must affirmatively allege facts in support of tolling where it is otherwise "apparent from the face of the complaint that the time limit for bringing the claim has passed," *Bishop,* 520 F.3d at 520 (internal quotation marks, alteration, and citation omitted), nothing of the sort is apparent here.  Rather, GEICO has alleged that it is a member of the putative EPP class in each of the relevant part-specific cases in the multidistrict litigation.  It further states without dispute that prior to opting out, it was a member of the settlement class in each of these cases.  Moreover, GEICO's appeal to class action tolling must be considered in conjunction with its invocation of the discovery rule and the doctrine of fraudulent concealment and its allegations of continuing violations.  The complex, fact-intensive interactions among these legal principles preclude a determination as a matter of law that Defendants necessarily will prevail on their affirmative defense of the statute of limitations.

### G.    Defendants' Challenges to GEICO's Antitrust Claims Under the Laws of Various States

Defendants next seek the dismissal of many of GEICO's state law antitrust claims on various grounds.  The Court addresses each of these challenges in turn.

#### 1.    GEICO's Antitrust Claims Under the Laws of the So-Called "Nexus" States Must Be Dismissed for Failure to Allege a Nexus Between Defendants' Conduct and Intrastate Commerce.

The parties agree that under the antitrust laws of certain states — *i.e.,* Alabama, Mississippi, Nevada, New York, North Carolina, South Dakota, Tennessee, and West Virginia, (*see* Defendants' Motion, Br. in Support at 35 (citing Ex. D, collecting relevant authority)) — as well as the District of Columbia (collectively, the "Nexus States"), the plaintiff must "allege a nexus between the defendant's conduct and intrastate commerce." *Wire Harnesses,* 2013 WL 2456612, at *19.  In seeking the dismissal of GEICO's claims brought under the antitrust laws of these jurisdictions, Defendants argue that the allegations of GEICO's complaint fail to establish this requisite nexus, where "GEICO does not allege purchases of [relevant] [a]uto [p]arts in the Nexus States or that any GEICO plaintiff resides in the Nexus States."  (Defendants' Motion, Br. in Support at 35.)  The Court agrees.

In an effort to turn aside Defendants' challenge to its allegations of a nexus with intrastate commerce, GEICO points to the passages in its complaint alleging that Defendants' conduct "(i) fixed, raised, maintained and stabilized" the prices of relevant auto parts in each of the Nexus States, (ii) "restrained, suppressed and eliminated price competition for" the relevant auto parts throughout each of the Nexus States, (iii) "deprived GEICO and its insureds and claimants of free and open competition" in the submarkets for the relevant auto parts, and (iv) "resulted in GEICO paying supra-competitive, artificially high prices for" relevant auto parts.  (SAC at ¶¶ 202-27.)  GEICO further alleges that "in each of the . . . states" identified in its complaint, it "has been injured in its business and property" as a result of Defendants' alleged price-fixing conspiracies.  (*Id.* at ¶ 228.)  In GEICO's view, this Court has "found the EPPs' similar

allegations to be sufficient to support [the] EPPs' state antitrust claims." (Plaintiffs' Response Br. at 34 (citing *Wire Harnesses,* 2013 WL 2456612, at *20).)

Yet, as Defendants correctly observe, this Court has distinguished its *Wire Harnesses* ruling in other decisions in the multidistrict litigation, and the grounds for this distinction are present here. Most notably, in *In re Automotive Parts Antitrust Litigation (In re Wire Harness Cases),* 2015 WL 10376960, at *7 (E.D. Mich. Dec. 30, 2015), the Court observed that the EPPs in *Wire Harnesses* had "alleged residency of the named plaintiffs in the nexus states," while the truck and equipment dealership ("TED") plaintiffs had made no such "express or implied allegations of in-state residency or injury." Because none of the TED plaintiffs alleged that they "reside[d] or were injured in the nexus states," the Court ordered the dismissal of the antitrust claims brought under the laws of those states. *Id.*

This reasoning leads to the same outcome here. Although GEICO views the allegations of its complaint as establishing that it paid "supracompetitive, artificially high prices for [a]uto [p]arts in" each of the Nexus States, (Plaintiffs' Response Br. at 34), Defendants correctly observe that the complaint stops short of "mentioning where any purchases were made," (Defendants' Reply Br. at 21). Rather, the complaint alleges only (i) that Defendants' alleged price-fixing conspiracies "resulted in GEICO paying supra-competitive, artificially high prices for" relevant auto parts, (*see, e.g.* SAC at ¶ 202(a)), and (ii) that as a result, GEICO "has been injured in its business and property" in "each of" the jurisdictions identified in its complaint, (*id.* at ¶ 228). As Defendants point out, GEICO "does not dispute that it must allege a purchase in a Nexus State to maintain a claim under a Nexus State's antitrust laws," yet it notably fails to do so.

65

(Defendants' Reply Br. at 21.)  As with the TED plaintiffs, the Court likewise concludes here that GEICO's antitrust claims under the laws of the Nexus States are subject to dismissal for lack of allegations of a nexus between Defendants' allegedly unlawful conduct and GEICO's commercial activity within those jurisdictions.

To be sure, if the Court were to consider GEICO's alleged injuries sustained in its role as insurer, it might be reasonable to infer that GEICO, as one of the nation's largest automotive insurers, has made relevant payments to its insureds or third-party claimants in each of the Nexus States.  As explained earlier, however, the allegations of GEICO's complaint are insufficient to establish GEICO's standing as an insurer to bring antitrust claims under federal or state law.  Rather, GEICO's antitrust claims are viable only to the extent that they rest upon GEICO's direct purchase of relevant auto parts or its ownership of a fleet of vehicles, and GEICO's complaint fails to allege any such purchases of relevant auto parts or vehicles in any of the Nexus States.  It follows that GEICO's antitrust claims under the laws of the Nexus States must be dismissed.

### 2.   Because None of the GEICO Entities Is a Citizen or Resident of Utah, GEICO Cannot Pursue an Antitrust Claim Under Utah Law.

Under Utah law, a plaintiff must be "a citizen of this state or a resident of this state" in order to bring to claim under Utah's Antitrust Act.  Utah Code Ann. § 76-10-3109(1)(a).  In reliance on this statutory language, a number of courts have dismissed claims brought under Utah antitrust law by plaintiffs who were neither citizens nor residents of Utah.  *See, e.g., In re Opana ER Antitrust Litigation,* 162 F. Supp.3d 704, 725 (N.D. Ill. 2016); *In re Aggrenox Antitrust Litigation,* 94 F. Supp.3d 224, 251-52 (D. Conn. 2015); *In re Niaspan Antitrust Litigation,* 42 F. Supp.3d 735, 759-60 (E.D. Pa.

66

2014).  Defendants contend that GEICO's claim under Utah antitrust law is likewise subject to dismissal, where none of the GEICO entities named as plaintiffs in this action is a Utah citizen or resident.

In response, GEICO states that it has sufficient contacts with the State of Utah to sue or be sued in the courts of that state.  Be that as it may, Utah antitrust law demands Utah citizenship or residency, and not the capacity to sue or be sued in that state. Although GEICO suggests that the above-cited cases are inapposite, those cases precisely track the language of the pertinent Utah statute, and do not engage in the jurisdictional inquiry urged by GEICO.  Nor has GEICO identified any case law or other authority that supports its proposed reading of Utah antitrust law.  In accordance with the uniform weight of authority, the Court finds that GEICO's antitrust claim under Utah law must be dismissed.

### 3.   GEICO's Antitrust Claim Under Oregon Law Is Subject to Dismissal for Lack of Allegations of Injury to a Person or Property in That State.

The Oregon legislature has mandated that the state's antitrust law applies only to "intrastate trade or commerce, and to interstate trade or commerce involving an actual or threatened injury to a person or property located in this state."  Oregon Rev. Stat. § 646.715(2).  As already discussed with respect to the antitrust laws of the Nexus States, the allegations of GEICO's complaint do not establish a connection between Defendants' allegedly unlawful conduct and any relevant intrastate activities engaged in by any of the GEICO entities in the state of Oregon, where none of these entities reside in that state.  This leaves only the possibility that Defendants' allegedly anticompetitive

activities had an effect on interstate trade or commerce that threatened or caused injury "to a person or property located in" Oregon.

The Court agrees with Defendants that the allegations of the complaint fail to support this theory of recovery.  Again, the GEICO entities do not reside in Oregon, nor is there any allegation that GEICO owns any property in that state.  To the extent that GEICO points to the allegations of its complaint as demonstrating that "Defendants caused GEICO to pay supracompetitive, artificially high prices for [a]uto [p]arts in Oregon," (Plaintiffs' Response Br. at 36), the cited portion of the complaint alleges only that Defendants' alleged price-fixing conspiracies "resulted in GEICO paying supra-competitive, artificially high prices for [a]uto [p]arts," (SAC at ¶ 221(a)), without indicating that any such purchases occurred in Oregon.  Although GEICO further asserts that it made payments to repair facilities located in Oregon and to insureds and third-party claimants who reside in that state, (Plaintiffs' Response Br. at 36), the complaint lacks any such specific allegations and, in any event, the Court has already determined that GEICO lacks standing as an insurer to bring antitrust claims under state or federal law arising from its alleged reimbursement payments to repair facilities, insureds, or third-party claimants.  Finally, Defendants aptly observe that even if GEICO made such payments as an insurer to facilities or individuals located in Oregon, the resulting injury presumably would be sustained by the GEICO entities in the states where they reside, and this would not establish the requisite injury "to a person or property located in" Oregon as necessary to bring an antitrust claim under that state's law.  Thus, GEICO has failed to plead a viable antitrust claim under Oregon law.

**4.    GEICO Cannot Recover Damages Under New Hampshire's or Utah's Antitrust Laws for Conduct That Occurred Prior to the Enactment of Legislation That Permits Recovery by Indirect Purchasers.**

As noted earlier, a number of states have enacted so-called "*Illinois Brick* repealer statutes*" — that is, statutes that override the Supreme Court's decision in *Illinois Brick, supra,* and allow recovery by indirect purchasers under state law. Effective January 1, 2008, New Hampshire passed such a law allowing recovery of damages by indirect purchasers.  *See* N.H. Rev. Stat. Ann. § 356.11.  Likewise, effective May 1, 2006, Utah amended a provision of its antitrust law to permit recovery by indirect purchasers.  *See* Utah Code Ann. 76-10-3109(1)(a).  Defendants contend, and GEICO does not dispute, (*see* Plaintiffs' Response Br. at 36-37), that these enactments operate to limit GEICO's recovery under the antitrust laws of New Hampshire and Utah to the damages resulting from Defendants' alleged anticompetitive activities that occurred on or after the effective dates of these *Illinois Brick* repealer provisions.  Indeed, the Court so held in the multidistrict litigation, *see Wire Harnesses,* 2013 WL 2456612, at *19, and GEICO does not suggest any basis for a different outcome here.

Defendants further contend that GEICO's recovery under Hawaiian antitrust law is similarly limited by the Hawaiian legislature's June 2002 passage of an amendment to Haw. Rev. Stat. § 480-2.  In Defendants' view, this enactment created an avenue for indirect purchaser recovery where none was available before.  Defendants recognize that this Court rejected this same argument in the multidistrict litigation, *see Wire Harnesses,* 2013 WL 2456612, at *18, but they suggest that the Court mistakenly relied

69

on a ruling, *In re Static Random Access Memory (SRAM) Antitrust Litigation,* No. 07-md-01819, 2010 WL 5094289, at *5 (N.D. Cal. Dec. 8, 2010), that cannot be reconciled with certain decisions of the Hawaiian courts holding that the relevant June 2002 amendment to the Hawaiian law of unfair competition should be applied only prospectively. (Defendants' Reply Br. at 22 n.25 (citing *Hawaii Medical Ass'n v. Hawaii Medical Service Ass'n, Inc.,* 148 P.3d 1179, 1209 (Haw. 2006), and *Tour2000 Co. v. Koreana Tour Service, Inc.,* No. 28209, 2009 WL 3437431, at *12 (Haw. Ct. App. Oct. 23, 2009)).)

The state court decisions cited by Defendants do not warrant a departure from the Court's ruling in the multidistrict litigation. As noted, this Court relied on the decision in *Static Random Access Memory,* 2010 WL 5094289, at *5, and that court, in turn, discussed the Hawaiian Supreme Court's holding in 1999 that the Hawaiian legislature had not conferred "a private claim for relief under [Haw. Rev. Stat.] § 480-13 for unfair methods of competition in violation of [Haw. Rev. Stat.] § 480-2." *Robert's Hawaii School Bus, Inc. v. Laupahoehoe Transportation Co.,* 982 P.2d 853, 880 (Haw. 1999) (footnote omitted). As explained in *Static Random Access Memory,* 2010 WL 9094289, at *5, although the Hawaiian legislature's 2002 enactment supplanted this particular aspect of the Hawaiian Supreme Court's decision in *Robert's Hawaii School Bus,* the Hawaiian court emphasized in that same decision that its interpretation of Haw. Rev. Stat. § 480-2 as it read in 1999 did not operate to limit "private claims for violations of [Haw. Rev. Stat.] §§ 480-4 or 480-9." *Robert's Hawaii School Bus,* 982 P.2d at 880. Because the indirect purchaser plaintiffs in *Static Random Access Memory* were pursuing a price-fixing conspiracy claim under Haw. Rev. Stat. § 480-4, and not a claim

70

for unfair methods of competition under Haw. Rev. Stat. § 480-2, the court in that case reasoned that the state legislature's 2002 amendment to § 480-2 could not properly be construed as an implied repeal of a previously existing *Illinois Brick*-style limitation on indirect purchaser recoveries under § 480-4, where this latter provision was wholly unaffected by the legislature's 2002 enactment. *Static Random Access Memory,* 2010 WL 5094289, at *5.

Viewed against this backdrop, the state court decisions cited by Defendants are inapposite, and do nothing to undermine this Court's reliance on *Static Random Access Memory.* In each of these cases, the court held that the legislature's 2002 amendment to Haw. Rev. Stat. § 480-2 did not apply retroactively to permit recovery ***under § 480-2*** for unlawful acts committed prior to the June 28, 2002 effective date of this amendment. *See Hawaii Medical Ass'n,* 148 P.2d at 1209; *Tour2000 Co.,* 2009 WL 3437431, at *12. Here, however, as in *Static Random Access Memory,* GEICO has asserted claims of price-fixing conspiracies, which are governed by Haw. Rev. Stat. § 480-4 rather than § 480-2. Nothing in the Hawaiian legislature's 2002 amendment of the latter statute suggests an intention to repeal an *Illinois Brick* limitation that was previously found in the former statute. To the contrary, § 480-4 was wholly unchanged by this 2002 amendment. Accordingly, the Court adheres to its ruling in *Wire Harnesses,* 2013 WL 2456612, at *18, and finds that the 2002 amendment does not limit GEICO's recovery under Hawaiian antitrust law.

**H.   Defendants' Challenges to GEICO's Claims Under the Consumer Protection Laws of Various States**

71

In the third count of its second amended complaint, GEICO seeks to recover under the consumer protection statutes of various states.  Defendants challenge these claims on various grounds, each of which is addressed below.

### 1.    GEICO Has Adequately Pleaded Violations of the Consumer Protection Laws of Arkansas, New Mexico, and Nevada.

In Defendants' view, three of GEICO's state law consumer protection claims — *i.e.,* the claims brought under the consumer protection laws of Arkansas, New Mexico, and Nevada — are subject to dismissal as wholly derivative of federal or state law antitrust claims that likewise should be dismissed.  In support of their challenges to GEICO's claims under Arkansas and New Mexico law, Defendants point primarily to the decision in *In re Graphics Processing Units Antitrust Litigation,* 527 F. Supp.2d 1011, 1029-30 (N.D. Cal. 2007), as purportedly "dismissing Arkansas and New Mexico consumer protection claims based on failed antitrust claims."  (Defendants' Motion, Br. in Support at 38-39.)  Yet, as GEICO points out, the court in *Graphics Processing Units* did not dismiss the Arkansas and New Mexico claims due to the plaintiffs' purported failure to establish an underlying violation of antitrust law, but rather for failure to allege unconscionable conduct within the meaning of the relevant state statutes.  *See Graphics Processing Units,* 527 F. Supp.2d at 1029-30.  Similarly, although Defendants cite the decision in *Wallis v. Ford Motor Co.,* 208 S.W.3d 153, 161-62 (Ark. 2005), as support for the proposition that a claim under the Arkansas Deceptive Trade Practices Act ("ADTPA") is subject to dismissal if it is "premised on antitrust violations," (Defendants' Motion, Br. in Support at 38-39), the court in that case addressed a design defect claim, not allegations of antitrust violations, and it held that the plaintiff had not

pleaded the requisite "actual damage or injury" through allegations of "diminution in value of the product," *Wallis,* 208 S.W.3d at 161.  Accordingly, *Wallis* is inapposite, as this Court previously explained in the multidistrict litigation.  *See Instrument Panel Clusters,* 2014 WL 2993753, at *19-*20.

Defendants fare somewhat better in their challenge to GEICO's consumer protection claim under Nevada law, but not enough to secure the dismissal of this claim. As Defendants observe, one way a plaintiff can establish a "deceptive trade practice" under Nevada law is by showing that the defendant "knowingly. . . [v]iolate[d] a state or federal statute or regulation relating to the sale or lease of goods or services."  Nev. Rev. Stat. § 598.0923.  In this case, GEICO has alleged that "Defendants' unlawful conduct constitutes deceptive trade practices in violation of Nevada Revised Statutes § 598.0923[] because Defendants knowingly violated" Nevada's antitrust statute.  (SAC at ¶ 236(b).)  As discussed earlier, Nevada is one of the "Nexus States," and GEICO's antitrust claim under Nevada law is subject to dismissal for lack of allegations of a nexus between Defendants' allegedly unlawful conduct and injury sustained by GEICO in Nevada.  It follows that GEICO cannot establish a deceptive trade practice under § 598.0923 by appealing to a violation of Nevada antitrust law.  *See Sobel v. Hertz Corp.,* 698 F. Supp.2d 1218, 1230 (D. Nev. 2010) (dismissing the plaintiffs' claim under § 598.0923 for failure to establish an underlying violation of another Nevada statute), *rev'd on other grounds,* 674 F. App'x 663 (9th Cir. 2017).

This is not the end of the matter, however, because there are other ways to demonstrate that a defendant has engaged in a "deceptive trade practice" as defined under Nevada law.  In particular, GEICO points to different language in § 598.0923

providing that a person engages in a deceptive trade practice if he or she knowingly "[f]ails to disclose a material fact in connection with the sale or lease of goods or services." Admittedly, GEICO's complaint does not expressly cite to or rely upon this particular definition of a deceptive trade practice, but GEICO nonetheless insists that it has sufficiently invoked this provision through its citation to Nevada's Deceptive Trade Practices Act as a whole. (*See* SAC at ¶ 236.) GEICO further asserts that it has adequately pleaded this type of unlawful practice through its allegations that Defendants knowingly agreed to fix prices of auto parts and "undertook efforts to conceal their agreements from GEICO and other purchasers." (*Id.* at ¶ 236(a).) Although this Nevada claim has not been artfully pleaded, the Court finds that it withstands Defendants' present challenge, particularly where GEICO will have an opportunity to provide more detailed allegations when it files the amended pleadings authorized elsewhere in this opinion and order.

Next, Defendants contend that GEICO's claims under the consumer protection laws of Arkansas and New Mexico are subject to dismissal on the additional ground that GEICO has failed to allege unconscionable conduct as purportedly dictated by the relevant state statutes. *See* Ark. Code Ann. § 4-88-107(a) (defining the "[d]eceptive and unconscionable trade practices made unlawful and prohibited by this chapter"); N.M. Stat. Ann. § 57-12-2(E) (defining an "unconscionable trade practice"). As GEICO observes in response, however, this Court rejected essentially the same challenges in the multidistrict litigation. *See Fuel Senders,* 29 F. Supp.3d at 1008-09; *Wire Harnesses,* 2013 WL 2456612, at *24-*25. Regarding Arkansas's consumer protection law, the Court explained that the state statute "does not limit itself to unconscionable

74

acts," and that allegations of "false or deceptive acts" suffice to state a claim.  *Wire Harnesses,* 2013 WL 2456612, at *24.  As for the New Mexico statute, the Court observed that its definition of an "unconscionable trade practice" encompasses acts or practices that "take[] advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree" or that "result[] in a gross disparity between the value received by a person and the price paid."  *Id.* at *25 (quoting N.M. Rev. Stat. 57-12-2(E)).  In support of their consumer protection claims under Arkansas and New Mexico law, the EPPs and IPPs in the multidistrict litigation made allegations similar to those advanced by GEICO here, and the Court found these allegations sufficient to withstand scrutiny under Rule 12(b)(6).  *See Fuel Senders,* 29 F. Supp.3d at 1008-09; *Wire Harnesses,* 2013 WL 2456612, at *24-*25.  Defendants do not acknowledge these rulings, much less explain why the result here should be different.  Accordingly, the Court finds that GEICO has sufficiently pleaded claims under the consumer protection laws of Arkansas, New Mexico, and Nevada.

> ### 2. To the Extent It Seeks to Recover as an Insurer, GEICO's Alleged Injuries Are Too Remote from Defendants' Alleged Wrongdoing To Sustain Its Consumer Protection Claims Under the Laws of Arkansas, New York, and Vermont.

As discussed earlier, the courts have applied the factors identified in the Supreme Court's *AGC* decision to determine whether a plaintiff's injuries are too remote from the defendant's alleged wrongdoing to permit a recovery under federal or state antitrust law.  Defendants argue, and GEICO does not dispute, that the courts have engaged in a similar "remoteness" inquiry, either with or without specific reference to the *AGC* factors, in determining whether a plaintiff may pursue a claim under the consumer

protection laws of Arkansas, New York, or Vermont. *See, e.g. Independence County v. Pfizer, Inc.,* 534 F. Supp.2d 882, 888-89 (E.D. Ark. 2008) (addressing a claim under Arkansas's consumer protection statute), *aff'd,* 552 F.3d 659 (8th Cir. 2009): *State of New York v. Daicel Chemical Industries, Ltd.,* 840 N.Y.S.2d 8, 12 (N.Y. App. Div. 2007) (applying New York law); *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation,* 536 F. Supp.2d 1129, 1142 (N.D. Cal. 2008) (finding that a claim under New York's consumer protection statute "should be assessed with reference to [the] *AGC* factors"); *Fucile v. Visa U.S.A., Inc.,* No. S1560-03, 2004 WL 3030037, at *3 (Vt. Super. Ct. Dec. 27, 2004) (applying Vermont law). In Defendants' view, just as GEICO purportedly has failed to satisfy the *AGC* factors with respect to its claims under federal and state antitrust law, it likewise cannot satisfy these factors in support of its claims under the consumer protection laws of these three states.

The Court addressed this issue in the multidistrict litigation, explaining that its analysis of the *AGC* factors with respect to the plaintiffs' antitrust claims applied as well to the remoteness inquiry called for under the consumer protection laws of Arkansas, New York, and Vermont. *See Fuel Senders,* 29 F. Supp.3d at 1012; *Wire Harnesses,* 2013 WL 2456612, at *30. In this case, the Court's earlier analysis of the *AGC* factors led to the conclusion that GEICO could pursue antitrust claims in its capacities as a purchaser of auto parts and the owner of a fleet of vehicles, but not as an insurer. As in the multidistrict litigation, the Court finds that this analysis applies as well to GEICO's consumer protection claims under the laws of Arkansas, New York, and Vermont. Thus, GEICO may pursue these claims only to as to transactions in which it purchased relevant auto parts or acted in its capacity as owner of a fleet of vehicles, but not in its

capacity as an insurer that made payments to repair facilities, insureds, or third-party claimants.

### 3.    GEICO Has Alleged a Sufficient Nexus Between Defendants' Alleged Anticompetitive Conduct and the States of California, New Hampshire, New York, and North Carolina.

Defendants next point to requirements under the consumer protection laws of California, New Hampshire, New York, and North Carolina that there must be a nexus between a defendant's allegedly unlawful conduct and intrastate commerce, and they argue that the allegations of GEICO's complaint fail to establish this required nexus.  In response, GEICO observes that this Court addressed precisely these same challenges in the multidistrict litigation, finding that the allegations in those cases satisfied the nexus requirements of the various state consumer protection statutes.  *See Fuel Senders,* 29 F. Supp.3d at 1010-12 (considering claims under the consumer protection laws of California, New York, and North Carolina); *Instrument Panel Clusters,* 2014 WL 2993753, at *21-*23 (same); *Wire Harnesses,* 2013 WL 2456612, at *28-*29 (addressing claims under California law).

To be sure, these rulings were based in part on allegations that residents of these states purchased the auto parts at issue.  *See, e.g., Fuel Senders,* 29 F. Supp.3d at 1010.  Despite GEICO's claims to the contrary, the complaint here lacks comparable allegations that GEICO paid supra-competitive prices for relevant auto parts in each of the states in question.  Nonetheless, this Court also cited allegations that the defendant auto suppliers' "anticompetitive conduct caused supracom[]petitive price effects nationwide" as sufficient to establish the required nexus with intrastate commerce, *Wire Harnesses,* 2013 WL 2456612, at *29; *see also Fuel Senders,* 29 F. Supp.3d at 1010-

77

12; *Instrument Panel Clusters,* 2014 WL 2993753, at *21-*23, and GEICO has made similar allegations in support of the claims at issue here, (*see* SAC at ¶¶ 234(c), 237(c), 239(e), 240(e)).  Moreover, although this Court has not addressed claims under New Hampshire's consumer protection statute in its decisions in the multidistrict litigation, GEICO points to the ruling of another court that the nexus requirement of the New Hampshire statute was satisfied through allegations that the "defendants colluded to fix the price of chocolate products that were then introduced into the New Hampshire market."  *In re Chocolate Confectionary Antitrust Litigation,* 749 F. Supp.2d 224, 235 (M.D. Pa. 2010).  It follows that GEICO's similar allegations here are likewise sufficient to satisfy this requirement.

Faced with these arguments by GEICO, Defendants do not even acknowledge the relevant rulings of this Court in the multidistrict litigation, much less endeavor to explain why GEICO's allegations here are sufficiently distinguishable to warrant a different outcome.  In the absence of any suggestion why it should not do so, the Court elects to adhere to its decisions in the multidistrict litigation, and therefore holds that GEICO has adequately pleaded the nexus element of its consumer protection claims under the laws of California, New Hampshire, New York, and North Carolina.

### 4. GEICO Need Not Satisfy the Standards of Fed. R. Civ. P. 9(b) to State a Consumer Protection Claim Under Florida Law.

Defendants next challenge GEICO's claim under Florida consumer protection law, arguing that such claims must be pleaded with the particularity mandated by Fed. R. Civ. P. 9(b) for allegations of fraud.  Once again, however, the Court squarely rejected this assertion in *Wire Harnesses,* 2013 WL 2456612, at *23-*24, despite the

defendants' appeal in that case to precisely the same unpublished opinion relied upon

by Defendants here.  Defendants do not attempt to distinguish this Court's prior ruling,

nor even acknowledge it.  Thus, the Court finds no basis for departing from its analysis

of this issue in the multidistrict litigation.[8]

> ### 5.   GEICO's Consumer Protection Claim Under Vermont Law May Rest Upon Its Purchases of Auto Parts for Its Own Benefit, But Not Its Payments as an Insurer.

Under the Vermont Consumer Fraud Act ("VCFA"), Vt. Stat. Ann. tit. 9, § 2451 *et*

*seq.,* only a "consumer" may bring a suit alleging a violation of this statute, Vt. Stat. Ann.

tit. 9, § 2461(b).  As relevant here, the VCFA defines a "consumer" as "a person who

purchases, leases, contracts for, or otherwise agrees to pay consideration for goods or

services not for resale in the ordinary course of his or her trade or business but for the

use or benefit of his or her business or in connection with the operation of his or her

business," Vt. Stat. Ann. tit. 9, § 2451a(a), and Vermont law provides more generally

that a statutory reference to a "person" encompasses corporations such as the GEICO

entities in this case, *see* Vt. Stat. Ann. tit. 1, § 128.  In Defendants' view, even if an

insurance company such as GEICO might qualify as a "person" under the VCFA, it is

not eligible for treatment as a "consumer" under the Vermont act because, to the extent

that it made payments as an insurer, it did not engage in these transactions for the "use

---

[8]In their reply brief, Defendants do not address GEICO's consumer protection claim under Florida law, but instead suggest for the first time that GEICO's claim under New York's consumer protection law must be pleaded with particularity.  (*See* Defendants' Reply Br. at 23-24.)  Because this argument was advanced for the first time in Defendants' reply brief, the Court declines to consider it.  *See Sundberg,* 189 F. Supp.2d at 682-83.

or benefit" of its own business, but rather for the benefit of its insureds.  It follows, according to Defendants, that GEICO's claim under the VCFA must be dismissed.

In response, GEICO points to case law holding, in reliance on the plain language of the VCFA itself, that this Vermont statute "countenances a lawsuit brought by a corporation that purchased goods or services for the use or benefit of the business or in connection with the operation of the business, as long as the goods or services were not purchased for resale."  *Ascension Technology Corp. v. McDonald Investments, Inc.,* 327 F. Supp.2d 271, 276 (D. Vt. 2003).  In light of this interpretation, GEICO argues that it has sufficiently pleaded a claim under the VCFA through its allegations that it "purchased [relevant] [a]uto [p]arts from Defendants at artificially and illegally inflated prices on behalf of itself and as part of its contractual obligations to its insureds and claimants."  (Plaintiffs' Response Br. at 42.)  GEICO asserts that under either circumstance, auto parts were purchased "in connection with the operation of [GEICO's] business," whether as an owner of vehicles or as an insurer, and it maintains that this is sufficient to support a claim under the VCFA.

As Defendants point out, however, the Supreme Court of Vermont has held to the contrary, at least as to transactions engaged in by an insurer.  In *Wilder v. Aetna Life & Casualty Insurance Co.,* 433 A.2d 309 (Vt. 1981), the plaintiff brought a claim under the VCFA based on the defendant insurer's alleged failure to make a payment as allegedly called for under a settlement agreement, but the court held that this claim was subject to dismissal on two grounds.  First, the court reasoned that "the selling of an insurance policy is not a contract for 'goods or services' within the meaning of" the VCFA.  *Wilder,* 433 A.2d at 310.  Next, and of relevance here, the court observed that

80

"we are not dealing with a contractual situation between buyer and seller," but that the court instead was being "asked to read into the [VCFA] a transaction one step removed" from a transaction in which a buyer purchases goods or services.  433 A.2d at 310.  In the court's view, the VCFA "deal[s] solely with consumer transactions in which there is an actual sale of goods or services involving a buyer, a seller, and the goods or services," and it declined to "stretch [the Act's] meaning as to evade the Legislature's intent."  433 A.2d at 310.

The Court agrees with Defendants that this reading of the VCFA by Vermont's highest court precludes GEICO from recovering under the Act in its role as insurer. Although GEICO's payments as an insurer may reflect or somehow involve an underlying purchase of a relevant auto part — though, as already discussed, this is not invariably the case — such an insurance transaction is one step removed from the consumer transaction that the VCFA is intended to regulate — *i.e.,* the underlying purchase of a relevant auto part by a buyer from a seller.  To be sure, GEICO allegedly engages in some consumer transactions of this sort in its role as the owner of a fleet of vehicles, and it may pursue a claim under the VCFA arising from these transactions.  To the extent, however, that GEICO seeks to recover in its capacity as an insurer that makes payments to insureds or third-party claimants, the Court finds that such a recovery is not permitted under the VCFA.

**I.      Defendants' Challenges to GEICO's State Law Claims of Unjust Enrichment**

Finally, Defendants argue that GEICO's common-law claims of unjust enrichment brought under the laws of various states are subject to dismissal on a number of grounds.  The Court addresses each of these challenges in turn.

### 1.   GEICO May Properly Pursue Its Claims of Unjust Enrichment as an Alternative Theory of Recovery, Even If These Claims Rest Upon the Same Allegations as GEICO's State Law Antitrust Claims.

First, and most broadly, Defendants argue that all of GEICO's state law claims of unjust enrichment are subject to dismissal because the allegations in support of these claims "do nothing more than recast, and are duplicative of, the allegations of anticompetitive conspiratorial conduct that underlie GEICO's antitrust claims." (Defendants' Motion, Br. in Support at 42.)  In support of this challenge, Defendants point to cases holding that "unjust enrichment may not supply a valid cause of action in states where [the] plaintiffs are otherwise barred from recovery under [the] relevant antitrust and consumer protection statutes."  *In re Packaged Seafood Products Antitrust Litigation,* 242 F. Supp.3d 1033, 1088 (S.D. Cal. 2017); *see also In re Opana ER Antitrust Litigation,* MDL 2580, 2016 WL 4245516, at *2 (N.D. Ill. Aug. 11, 2016).

As GEICO correctly observes in response, however, a plaintiff is permitted under Fed. R. Civ. P. 8(a)(3) to plead multiple theories of recovery in the alternative, and there is no requirement that each such theory must rest upon its own independent set of allegations.  *See, e.g., In re K-Dur Antitrust Litigation,* 338 F. Supp.2d 517, 544 (D.N.J. 2004).  Defendants' argument to the contrary rests upon an overly broad reading of the above-cited cases, which hold only that a plaintiff who would otherwise be ***barred from recovery*** under the law of a particular state or its underlying policies cannot invoke a

theory of unjust enrichment as a means of avoiding this state law bar.  In *In re Packaged Seafood Products,* for example, the court first held that the end purchaser plaintiffs in that case could not pursue unjust enrichment claims "where the state otherwise bars indirect-purchaser recovery," but it then proceeded to evaluate the plaintiffs' "unjust enrichment arguments in states where their claims ***are not otherwise barred*** under [the] relevant antitrust and consumer protection laws."  242 F. Supp.3d at 1089 (emphasis added).  To be sure, Defendants separately challenge GEICO's unjust enrichment claims under the laws of various states as an inappropriate end run around state laws that would otherwise bar its recovery, and the Court addresses these challenges below.  Yet, Defendants' proposed application of this principle as an across-the-board bar to GEICO's recovery under a theory of unjust enrichment is not well taken, and the Court rejects it.

### 2. Defendants Have Failed to Provide Support for Their Assertion That the Antitrust Laws of Illinois, Maryland, and Rhode Island Preclude Recovery by Indirect Purchasers.

Defendants next advance a more specific variation on the broad contention addressed above:  namely, that Plaintiff cannot pursue claims of unjust enrichment under the laws of three specific states — Illinois, Maryland, and Rhode Island — because indirect purchasers purportedly are precluded from recovering under the antitrust laws of these states.  As noted earlier, a number of states have enacted so-called *Illinois Brick* repealer statutes that permit recovery by indirect purchasers under state antitrust law despite the prohibition against such a recovery under federal antitrust law.  In the absence of such a repealer statute, however, some courts have reasoned

that an indirect purchaser plaintiff should not be permitted to recover under the equitable theory of unjust enrichment, as this would permit the plaintiff to circumvent the bar expressed through state law and policy against recovery by an indirect purchaser. *See In re Packaged Seafood Products,* 242 F. Supp.2d at 1088-89; *In re Opana ER,* 2016 WL 4245516, at *2. In their present motion, Defendants assert that the three above-referenced states have not enacted *Illinois Brick* repealer statutes, but rather "continue to bar indirect purchaser claims under state antitrust law." (Defendants' Motion, Br. in Support at 43.) It follows, in Defendants' view, that GEICO should not be permitted to pursue claims of unjust enrichment under the laws of these states.

As GEICO aptly observes in response, however, Defendants cite no authority whatsoever for their *ipse dixit* assertion that the three specified states bar recovery by indirect purchasers under state antitrust law. To the contrary, GEICO states without contradiction that under Illinois law, at least, indirect purchaser plaintiffs are barred only from pursuing a **class action** antitrust suit. *See* 740 Ill. Comp. Stat. 10/7(2). Likewise, while the court in *In re Packaged Seafood Products* found that unjust enrichment claims could not be brought under the laws of states that "otherwise bar[] indirect-purchaser recovery," it notably proceeded to address the unjust enrichment claims of the indirect purchaser plaintiffs under the laws of states that did not "otherwise bar[]" recovery by indirect purchasers, and it identified Rhode Island as one such state. 242 F. Supp.3d at 1089, 1092. This leaves only Maryland, and Defendants do not identify any support whatsoever for their contention that indirect purchasers are barred from recovering under Maryland antitrust law. Accordingly, Defendants have not identified a basis for

84

the dismissal of GEICO's unjust enrichment claims under the laws of Illinois, Maryland, or Rhode Island.

### 3. GEICO Has Adequately Pleaded That Its Alleged Overpayments for Auto Parts Conferred a Benefit on Defendants, and That These Injuries Flowed from Defendants' Allegedly Unlawful Conduct.

In the fourth count of its second amended complaint, GEICO has asserted claims of unjust enrichment under the laws of 28 states and the District of Columbia. According to Defendants, the unjust enrichment laws of thirteen of these states, as well as the District of Columbia, require a plaintiff to allege that it conferred a direct benefit upon the defendant. As this Court has observed in the multidistrict litigation, the "critical inquiry" in evaluating this "direct benefit" element of a claim of unjust enrichment is "not whether the benefit is conferred directly on the defendant, but whether the plaintiff can establish [that] the relationship between his detriment and the defendant's benefit flows from the challenged conduct" of the defendant. *Fuel Senders,* 29 F. Supp.3d at 1015 (internal quotation marks and citation omitted). In Defendants' view, GEICO has failed to allege this requisite relationship, nor has it "describe[d] how it is possible to trace [GEICO's] alleged detriment through a quagmire of insurance contracts, deductibles, full and partial reimbursements, apportionments of fault, discount arrangements with suppliers and repair shops, payment caps, or insurance settlements for total losses to the Defendants' benefit." (Defendants' Motion, Br. in Support at 44.)

Yet, as a threshold matter, although this Court in the multidistrict litigation found it necessary to conduct a lengthy and comprehensive state-by-state inquiry in order to resolve a similar "direct benefit" challenge, *see, e.g., Fuel Senders,* 29 F. Supp.3d at

1015-29; *Instrument Panel Clusters,* 2014 WL 2993753, at *26-*38, Defendants fail to engage in any such analysis here.  Instead, Defendants merely provide a list of purportedly relevant case law as an exhibit to their motion, (*see* Defendants' Motion, Ex. F-1), without discussing these decisions or otherwise attempt to illustrate how the "direct benefit" element of a claim of unjust enrichment might be construed or applied under the law of any given state.  Plainly, the Court is under no obligation to fashion arguments or conduct such a state law survey on Defendants' behalf.

In any event, Defendants' challenge on this point is largely defeated by the Court's analysis of this issue in the multidistrict litigation.  As the Court emphasized at the threshold of its state-by-state inquiry, GEICO's allegations in support of its claims of unjust enrichment must not be considered "in isolation, but in light of all of the factual allegations in the complaint[]."  *Fuel Senders,* 29 F. Supp.3d at 1014; *see also Instrument Panel Clusters,* 2014 WL 2993753, at *25.  The Court further observed that "although the particular elements of [a claim of] unjust enrichment vary from jurisdiction to jurisdiction," this theory of recovery generally entails a showing "that Defendants received a benefit and under the circumstances of the case, retention of the benefit would be unjust."  *Fuel Senders,* 29 F. Supp.3d at 1014.

Against this backdrop, the Court has repeatedly embarked on the state-by-state analysis that Defendants have failed to provide in their present motion.  Specifically, on at least three separate occasions in the multidistrict litigation, this Court has expressly addressed and rejected the "direct benefit" challenge advanced by Defendants here under the laws of eleven of the thirteen states identified in Defendants' motion, as well as the District of Columbia.  *See In re Automotive Parts Antitrust Litigation (In re*

*Bearings),* 50 F. Supp.3d 836, 864-65 (E.D. Mich. 2014) ("Bearings"); *Fuel Senders,* 29 F. Supp.3d at 1017-28; *Instrument Panel Clusters,* 2014 WL 2993753, at *30-*38.  In the course of this state-by-state inquiry, the Court considered, and distinguished, many of the cases cited in Defendants' table of purportedly relevant authority.  Defendants have not acknowledged this Court's rulings in the multidistrict litigation, much less attempted to distinguish them, so there is no basis for the Court to depart from its prior treatment of the very same issues advanced by Defendants here.

These leaves only the unjust enrichment laws of two states, Alabama and Mississippi, that the Court had no occasion to address in the multidistrict litigation.  In support of their reading of Alabama law as demanding that a plaintiff must have conferred a direct benefit upon the defendant, Defendants point to the decision in *Danny Lynn Electrical & Plumbing, LLC v. Veolia ES Solid Waste Southeast, Inc.,* No. 2:09cv192, 2011 WL 2893629, at *6 (M.D. Ala. July 19, 2011).  In that case, the plaintiffs alleged that they paid unlawfully inflated waste removal fees to the corporate defendant, and that this defendant, in turn, paid a portion of its increased profits to the individual defendant employees in the form of higher annual bonuses.  Because "there was no money paid *by* the plaintiffs *to* the named individual[]" defendants, and there likewise was "no benefit conferred upon the individual defendants *by* the plaintiffs," the court held that the plaintiffs could not pursue claims of unjust enrichment against these individuals.  *Danny Lynn Electrical,* 2011 WL 2893629, at *6 (emphasis in original).  Yet, as explained by this Court in distinguishing an analogous "direct benefit" case decided under Florida law, the decision in *Danny Lynn Electrical* does not "involve the flow of payment up a chain of distribution."  *Fuel Senders,* 29 F. Supp.3d at 1018.  Rather, the

plaintiff in that case sought to expand the pool of defendants to include not only the corporate defendant that had demanded allegedly excessive fees, but also those individuals to whom the company had distributed a portion of its allegedly unlawful profits. Thus, the Alabama case law identified by Defendants fails to establish the proposition for which it is cited: namely, that a claim of unjust enrichment under Alabama law cannot rest upon a benefit that allegedly is traceable through a chain of distribution from the indirect purchaser plaintiff to the defendant supplier.

The Mississippi decision cited by Defendants is likewise distinguishable — and, indeed, this Court has already distinguished it in the multidistrict litigation, albeit on slightly different grounds. In *Omnibank of Mantee v. United Southern Bank,* 607 So.2d 76, 93 (Miss. 1992), the court held that "a person who has conferred a benefit on another, by making a contract with a third person, is not entitled to restitution from the other merely because of the failure of performance by the third person." As this Court observed in the multidistrict litigation, *Omnibank* "does not address the relationship of indirect purchasers [to defendant suppliers] on a price-fixing conspiracy claim, and there was no allegation of wrongdoing by the defendant" in that case. *Fuel Senders,* 29 F. Supp.2d at 1022. Just as *Omnibank* did not support the "benefit of the bargain" challenge advanced by the defendants in *Fuel Senders,* it has nothing to say about the "direct benefit" issue raised by Defendants here, and Defendants have not even attempted to put forward an argument that might lead the Court to conclude otherwise.

To be sure, Defendants point out that GEICO, in its role as insurer, has a more attenuated relationship with the Defendant auto parts suppliers than the indirect purchaser plaintiffs in the multidistrict litigation. Most notably, when GEICO makes a

88

Total Loss Payment — *i.e.,* a payment to an insured or third-party claimant for the total loss of a vehicle — none of this payment is spent on the purchase of auto parts for the totaled vehicle, and Defendants therefore derive no benefit from such payments.  Even where GEICO's payment as an insurer can ultimately be traced to the purchase of auto parts, Defendants observe that this payment is affected by myriad factors apart from Defendants' allegedly supracompetitive pricing, such as the terms of insurance contracts, deductibles, discount arrangements, payment caps, and insurance settlements.  (*See* Defendants' Motion, Br. in Support at 44.)  Although this Court has recognized in the multidistrict litigation that, under the laws of the relevant states, the requisite benefit to the defendant need not be conferred through direct contact with the plaintiff, *see Bearings,* 50 F. Supp.3d at 864-65 (collecting cases), and other federal district courts have reached the same conclusion under the laws of many of the same states, *see, e.g., In re Processed Egg Products Antitrust Litigation,* 851 F. Supp.2d 867, 927-34 (E.D. Pa. 2012); *In re TFT-LCD (Flat Panel) Antitrust Litigation,* 599 F. Supp.2d 1179, 1189-90 (N.D. Cal. 2009), GEICO nonetheless must allege that there is a "relationship between [its] detriment and [Defendants'] benefit [that] flows from the challenged conduct" of the Defendant auto parts suppliers, *Fuel Senders,* 29 F. Supp.3d at 1015 (internal quotation marks and citation omitted).

Admittedly, this requisite relationship between GEICO's detriment and benefit to one or more Defendant suppliers may be difficult, if not impossible, to ascertain in the case of at least some of GEICO's payments as an insurer.  Nevertheless, GEICO has identified other transactions in which it makes payments analogous to those remitted by a traditional indirect purchaser.  Most significantly, in its role as owner of a fleet of

89

automobiles, GEICO stands in precisely the same role as other end purchaser plaintiffs who have bought vehicles at allegedly inflated prices due to Defendants' alleged price-fixing conspiracies.  Even in GEICO's role as an insurer that makes payments to repair shops to cover the cost of replacement parts used in fixing an insured's or third-party claimant's vehicle, GEICO points to the widespread reliance on insurance to pay for replacement parts, (*see* Plaintiffs' Response Br. at 17), and it argues that this "generally-understood insurance paradigm" will enable it to forge a connection between its payments and a benefit to the Defendant parts suppliers, (*id.* at 45-47).  Against this backdrop, the Court is satisfied that GEICO has adequately pleaded a relationship between its detriment and benefit to the Defendant suppliers for at least some of the transactions identified in the complaint, and the Court declines at this juncture to inquire too deeply into which particular transactions may support a recovery under the unjust enrichment laws of a given state and which may not.

### 4.    GEICO Need Not Allege That It Failed To Receive the Benefit of the Bargain or Bargained-For Consideration in the Transactions Giving Rise to Its Claims of Unjust Enrichment.

Defendants next point to the laws of seventeen states, as well as the District of Columbia, as purportedly mandating the dismissal of claims of unjust enrichment "where [the] parties voluntarily have negotiated, entered into and fully performed their bargain." (Defendants' Motion, Br. in Support at 44 (quoting *In re Intel Corp. Microprocessor Antitrust Litigation,* 496 F. Supp.2d 404, 421 (D. Del. 2007) (internal quotation marks and citation omitted)).)  In Defendants' view, although GEICO alleges that it was overcharged for relevant auto parts, this allegation alone "is insufficient to state a claim for unjust enrichment where, as here, GEICO does not assert that it did not obtain what

90

it bargained for (*e.g.,* the settlement of an insurance claim)."  Similarly, Defendants

contend that GEICO's unjust enrichment claims under the laws of nine states are

defeated by virtue of Defendants having provided "bargained-for consideration" in the

form of functioning auto parts delivered to OEMs or other direct purchasers.

(Defendants' Motion, Br. in Support at 45-46.)  Once again, however, Defendants'

support for these challenges consists largely of tables of purportedly relevant

authorities, (*see* Defendants' Motion, Exs. F-2, F-3), without any accompanying

explanation of what these cases hold or how they might apply to the facts and

allegations presented here.

 More importantly, Defendants again have made no attempt to distinguish the

decisions of this Court in the multidistrict litigation that addressed and rejected these

very same challenges.  In *Bearings,* 50 F. Supp.3d at 865, for instance, the defendant

auto part suppliers contended that the IPPs' claims of unjust enrichment were subject to

dismissal because the plaintiffs had "entered into . . . voluntary agreement[s] and

received the benefits of their respective bargains."  The Court found that the case law

cited by the defendants in support of this challenge — a series of decisions that

overlaps considerably with the cases cited by Defendants here —  "does not support

dismissal of a price-fixing claim on this basis," but instead was distinguishable on the

ground that the plaintiffs in those cases had entered into contractual relationships with

the defendants.  *Bearings,* 50 F. Supp.3d at 865-67 (surveying cases from a number of

jurisdictions).  Thus, the Court concluded that the IPPs' unjust enrichment claims were

not subject to dismissal, explaining that "[i]n contrast to the case law cited by

Defendants, here the parties were not in a direct bargaining relationship" through which

the IPPs could have attained the benefit of a contractually agreed-upon bargain.  50 F. Supp.3d at 867; *see also Fuel Senders,* 29 F. Supp.3d at 1015-28 (likewise addressing most of the cases cited by Defendants here and concluding that the IPPs' claims of unjust enrichment were not subject to dismissal under this authority); *Instrument Panel Clusters,* 2014 WL 2993753, at \*26-\*38 (same).

These same decisions in the multidistrict litigation likewise defeat Defendants' contention that they cannot be held liable for unjust enrichment because they "provided consideration in exchange for any payments they received."  (Defendants' Motion, Br. in Support at 46 (footnote omitted).)  In *Bearings,* 50 F. Supp.3d at 863, for example, the Court first observed that the defendants had "failed to cite a single case finding that payment or receipt of anything of value from a defendant will defeat a plaintiff's claim[] for unjust enrichment."  As for the cases cited by the defendants in support of this challenge — nearly all of which Defendants likewise rely upon in this case — the Court found them distinguishable as either (i) arising "in the context of general contractor/subcontractor relationships," or (ii) addressing "inapposite" and fact-specific circumstances such as the terms of a particular contract or the liability of a principal for the actions of its agent.  *Bearings,* 50 F. Supp.3d at 863-64 (surveying cases); *see also Fuel Senders,* 29 F. Supp.3d at 982; *Instrument Panel Clusters,* 2014 WL 2993753, at \*26.  Consistent with these prior rulings in the multidistrict litigation, the Court holds that GEICO's unjust enrichment claims withstand Defendants' "benefit of the bargain" challenge, as well as Defendants' contention that the remedy of unjust enrichment is unavailable where the Defendant auto part suppliers provided consideration in exchange for the payments they received.

**5.    GEICO Has Satisfied the Specific Pleading Requirements Identified in Defendants' Motion.**

Finally, Defendants maintain that GEICO has not met the specific pleading requirements purportedly imposed under the unjust enrichment laws of Illinois, Mississippi, New York, Tennessee, and West Virginia.  As GEICO correctly observes in response, however, the Court rejected these very same challenges to state law claims of unjust enrichment in its decisions in the multidistrict litigation.  *See Bearings,* 50 F. Supp.3d at 867 (rejecting the defendants' challenge under Illinois law);[9] *Fuel Senders,* 29 F. Supp.3d at 1022 (declining to dismiss the IPPs' claim under Mississippi law); *Fuel Senders,* 29 F. Supp.3d at 1024 (rejecting the contention that the IPPs' claim under New York law was subject to dismissal because the connection between them and the defendant suppliers was "too attenuated"); *Bearings,* 50 F. Supp.3d at 868 (declining to apply an exhaustion-of-remedies requirement to the IPPs' claim under Tennessee law); *Fuel Senders,* 29 F. Supp.3d at 1028 (finding that the IPPs had adequately pleaded the elements of a claim of unjust enrichment under West Virginia law).

This leaves only Defendants' cursory contention — advanced in the span of three sentences and unaccompanied by any reasoned argument or discussion of supporting authority — that the laws of eleven states and the District of Columbia foreclose a claim for unjust enrichment where "the subject of the dispute is covered by a contract" that "affords [the plaintiff] an adequate remedy at law."  (Defendants' Motion, Br. in Support

_____

[9]It also is worth noting that the Illinois decision cited by Defendants here, *Martis v. Grinnell Mutual Reinsurance Co.,* 905 N.E.2d 920, 928 (Ill. App. Ct. 2009), has been called into doubt as "not an accurate statement of the [Illinois] law on the equitable claim for unjust enrichment," *National Union Fire Insurance Co. v. DiMucci,* 34 N.E.3d 1023, 1043 (Ill. App. Ct. 2015).

at 47.)  Although Defendants state as a matter of *ipse dixit* that the subject of the

dispute in this case is covered by the "contract[s] between GEICO and its insureds,"

(*id.)*, GEICO correctly observes in response that the true matter in dispute here —

namely, "the artificially inflated prices caused by Defendants' [allegedly] illegal conduct"

— cannot remotely be viewed as covered by or addressed in GEICO's insurance

contracts with its insureds.  (Plaintiffs' Response Br. at 49.)  Nor do Defendants suggest

how any relief available to GEICO under its insurance contracts might serve as an

adequate remedy at law for the overcharges giving rise to its claims of unjust

enrichment.  Finally, the Court has addressed and distinguished many of the cases

identified by Defendants in support of this challenge.  *See Fuel Senders,* 29 F. Supp.3d

at 1019; *Instrument Panel Clusters,* 2014 WL 2993753, at *27.  Accordingly, this final

challenge to GEICO's claims of unjust enrichment lacks merit.

## V.    CONCLUSION

For these reasons, the Court **GRANTS IN PART** and **DENIES IN PART**

Defendants' April 14, 2017 collective motion to dismiss GEICO's second amended

complaint (Dkt. 62).  Specifically, this motion is granted as to:  (i) GEICO's improper

joinder of sixteen part-specific antitrust conspiracy claims in a single suit; (ii) GEICO's

inadequate allegations of Article III standing to assert claims under the laws of each of

the various jurisdictions identified in its complaint; (iii) GEICO's lack of antitrust standing

in its capacity as insurer to pursue claims under federal and state antitrust law; (iv)

GEICO's assertion of antitrust claims under the laws of the nine jurisdictions identified

earlier in this opinion as the "Nexus States," as well as the laws of Utah and Oregon; (v)

GEICO's assertion of antitrust claims under the laws of New Hampshire and Utah arising from conduct that predated the states' enactment of *Illinois Brick* repealer provisions; and (vi) GEICO's assertion of consumer protection claims under the laws of Arkansas, New York, and Vermont in its capacity as insurer.  With respect to GEICO's improper joinder of separate part-specific conspiracies in a single suit and its inadequate allegations of Article III standing, GEICO is granted leave to file separate suits for each of the alleged part-specific conspiracies, and it may take this opportunity to address the Article III standing deficiencies identified in this opinion and order.  In all other respects, Defendants' motion is denied.

**IT IS SO ORDERED.**

Date:   August 30, 2018                    s/Marianne O. Battani
                                            MARIANNE O. BATTANI
                                            United States District Judge


CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on August 30, 2018.

                                            s/ Kay Doaks
                                            Case Manager