**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

GEICO CORPORATION, *et al.,*

    Plaintiffs,

v.

AUTOLIV, INC., *et al.,*

    Defendants.

_____/

Case No. 16-13189

Hon. Marianne O. Battani

**OPINION AND ORDER DENYING
<u>LEAR DEFENDANTS' MOTION TO DISMISS</u>**

**I.   INTRODUCTION**

Plaintiffs GEICO Corporation and a number of affiliated entities (collectively "GEICO") brought this suit on September 2, 2016, asserting federal antitrust and state law claims against the Defendant auto part manufacturers and suppliers arising from alleged conspiracies among these fourteen Defendants to fix prices, rig bids, and allocate the markets for sixteen auto parts.  GEICO was a putative member of the proposed liability and settlement classes in a number of the antitrust class action suits comprising *In re Automotive Parts Antitrust Litigation,* No. 12-md-02311, in which various groups of plaintiffs have alleged that auto part manufacturers and suppliers engaged in price-fixing conspiracies.  However, GEICO has elected to opt out of the settlement classes certified to date in this multidistrict litigation ("MDL"), and to instead pursue its own claims against the Defendant manufacturers and suppliers in its role as an alleged indirect purchaser of certain of the auto parts involved in the MDL.

All fourteen Defendants in this suit filed a collective motion to dismiss GEICO's second amended complaint, and the Court resolved this motion in a recent opinion and order. In addition to this collective motion, two of the Defendants — Lear Corporation and Kyungshin-Lear Sales & Engineering, LLC (collectively "Lear") — have separately moved to dismiss the specific claims asserted against them. These claims rest upon allegations that the Lear entities conspired with other auto parts suppliers to fix prices in the market for one particular part, wire harness systems. In seeking the dismissal of these claims, Lear argues that GEICO has effectively pleaded itself out of court with respect to its claims against the two Lear entities, where (i) GEICO's allegations in support of these claims purportedly rely heavily upon a criminal investigation by the U.S. Department of Justice ("DOJ") to define the scope of the alleged conspiracy to fix prices for wire harness systems, but (ii) Lear was neither investigated nor prosecuted by the DOJ. In response, GEICO contends that the Court already addressed and rejected this same argument when Lear raised it in the MDL, and that the allegations of GEICO's complaint warrant the same outcome here.

On November 9, 2017, the Court heard oral argument on Lear's motion. For the reasons set forth below, Lear's motion is **DENIED**.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The background facts of this case have been summarized in a separate decision addressing the Defendant auto part suppliers' collective motion to dismiss, *(see* Dkt. 74, 8/30/2018 Opinion and Order at 2-5), and this factual summary need not be repeated here. Briefly, GEICO alleges that Lear participated in a conspiracy to fix prices, rig bids,

and allocate markets for automotive wire harness systems that were sold to (i) original equipment manufacturers ("OEMs") for installation in new vehicles, and (ii) automotive repair professionals, who in turn installed these parts in automobiles to replace worn out, defective, or damaged parts.  (*See* Dkt. 53, Second Amended Complaint ("SAC") at ¶¶ 60-63, 126(d).)

In support of this claim of a price-fixing conspiracy, GEICO points to investigative efforts launched in 2010 by the DOJ and its counterparts in the European Union and Japan into suspected anticompetitive cartel conduct among auto part suppliers.  (*See id.* at ¶¶ 130-31.)  Over time, a number of manufacturing firms and executives have pleaded guilty to conspiracies to fix prices, rig bids, or allocate the market for specific auto parts.  (*See id.* at ¶ 132; *see also* Dkt. 61, Defendant Lear's Motion to Dismiss, App. A (compilation of indictments, plea agreements, and other materials relating to charges brought by the DOJ).)  The firms that have pleaded guilty and paid criminal fines include five Defendants in this case:  Autoliv, Inc., HIAMS, Panasonic Corporation, T.RAD Co. Ltd., and TRW Deutschland Holding GmbH.  (*See* SAC at ¶¶ 135-38.)  In addition, the guilty pleas that resulted from this antitrust investigation encompass each of the sixteen auto parts at issue in this suit.  (*See id.* at ¶¶ 134-38.)

Lear states without contradiction, however, that it has never been mentioned in any of the DOJ's public announcements of its investigation or in any of the criminal filings stemming from this investigation.  With respect to wire harness systems — the only auto part involved in GEICO's claims against Lear — the DOJ evidently concluded its investigation in 2012, and Lear states that it was never investigated by the DOJ, was

3

never accused of participating in any relevant conspiracy, and has never pleaded guilty to any criminal charges.

### III.     STANDARD OF REVIEW

Through the present motion, Lear seeks the dismissal under Fed. R. Civ. P. 12(b)(6) of the claims asserted against it in GEICO's second amended complaint. When determining whether GEICO's claims are subject to dismissal under this Rule for failure to state a claim upon which relief can be granted, the Court must construe the complaint in a light most favorable to GEICO and accept all well-pleaded factual allegations as true. *League of United Latin American Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007). The Court then must ask whether these facts, taken as true, "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007). Yet, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964-65 (internal quotation marks, alteration, and citations omitted). Rather, to withstand a motion to dismiss, the complaint's factual allegations, accepted as true, "must be enough to raise a right to relief above the speculative level," and to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570, 127 S. Ct. at 1965, 1974. "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949.

The Supreme Court has emphasized that this plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not shown — that the pleader is entitled to relief." *Iqbal,* 556 U.S. at 679, 129 S. Ct. at 1950 (internal quotation marks, alteration, and citation omitted). If a plaintiff does "not nudge[] [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974.

In *Twombly,* the Supreme Court applied these general Rule 12(b)(6) standards to an antitrust conspiracy claim brought under § 1 of the Sherman Act, 15 U.S.C. § 1:

> [S]tating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.

550 U.S. at 556, 127 S. Ct. at 1965 (internal quotation marks, citation, and footnote omitted).

### IV. ANALYSIS

In seeking the dismissal of the claims asserted against it, Lear contends that these claims are defeated by virtue of GEICO's reliance on the DOJ's public announcements, investigations, and prosecutions to describe how Lear and the other Defendants carried out their alleged conspiracies. Because Lear is never mentioned in the DOJ's public statements or criminal filings, and because there likewise is no indication that the DOJ ever uncovered any wrongdoing by Lear in its investigation, Lear argues that GEICO cannot plausibly allege that it took part in any conspiracy identified in the complaint. In response, GEICO submits that this Court has already addressed the precise issue raised in the present motion, holding in a 2013 decision that Lear was not entitled to the dismissal of the claims brought against it in the multidistrict litigation. In light of this prior ruling, GEICO contends that it has alleged sufficient facts here to support its claims against Lear, and that these allegations do not rest solely or unduly on the DOJ's investigation or the resulting criminal charges against several of Lear's co-defendants. As discussed below, the Court agrees with GEICO that its decision in the multidistrict litigation largely defeats Lear's similar challenge to the claims asserted against the Lear entities in this suit.

In its complaint, GEICO recounts the coordinated investigation by the DOJ and its counterparts in Europe and Japan into suspected "anticompetitive cartel conduct" by auto part suppliers. (SAC at ¶¶ 129-31.) As part of this investigation, the FBI and foreign law enforcement agencies executed search warrants and conducted parallel raids at the domestic and overseas offices of these suppliers. (*See id.* at ¶ 131.) The fruits of this investigation, in turn, led the DOJ to bring criminal charges against various

auto part suppliers and their executives, and several of these suppliers — including five of the firms named as Defendants in this action — agreed to plead guilty and pay substantial criminal fines for their roles in criminal price-fixing and bid-rigging conspiracies involving a number of auto parts. (*See id.* at ¶¶ 132-39.) As summarized in the complaint, the DOJ's public announcements in the course of this investigation "described how the Defendants and their co-conspirators carried out these multiple conspiracies" to fix prices, rig bids, and allocate the markets for auto parts. (*Id.* at ¶ 127.)

As is evident from these passages in the complaint, GEICO refers to the DOJ's investigative efforts, criminal charges, and public announcements as a means of "describ[ing]" the conspiracies giving rise to GEICO's claims against Lear and its co-defendants. (*Id.*) In Lear's view, these allegations demonstrate GEICO's intent to "rel[y] upon the DOJ's automotive parts criminal investigation to define the scope of the conspirac[ies]" alleged in the complaint. (Defendant Lear's Motion to Dismiss, Br. in Support at 2.) Because GEICO purportedly looks to the DOJ's public announcements as a "roadmap for the scope of the conspirac[ies]" identified in the complaint, and because Lear is "[c]ompletely absent from that roadmap" as well as the underlying DOJ announcements and criminal filings, Lear argues that the allegations of GEICO's complaint affirmatively establish that Lear was not a participant in any of these alleged conspiracies. (*Id.* at 2, 5-6.) It follows, in Lear's view, that GEICO's claims against this non-participant must be dismissed for lack of plausibility.

Yet, as GEICO observes in response, Lear unsuccessfully pursued a similar challenge in a motion to dismiss filed in the multidistrict litigation. In that earlier motion,

as here, Lear observed that "the Department of Justice ha[d] not named Lear as a target" of its investigation or "raided Lear's offices" in the course of this investigation, and Lear surmised that it had been named as a party to the multidistrict litigation "only because it happens to be in the same industry as those Defendants that entered guilty pleas" as a result of the DOJ investigation. *In re Automotive Parts Antitrust Litigation (In re Wire Harness Cases),* No. 12-00100, 2013 WL 2456010, at *3 (E.D. Mich. June 6, 2013) (*"Wire Harnesses"*). The Court rejected Lear's challenge to the sufficiency of the plaintiffs' allegations that Lear had participated in a conspiracy to fix prices and rig bids for wire harness systems:

> The sufficiency of the complaints do not turn on whether Lear is a named target. [The plaintiffs] allege Lear was involved in the conspiracy . . . . [They further] allege that [co-defendant] Furukawa had an ownership relationship with Lear relative to their joint venture, and Furukawa has pleaded guilty to price-fixing and bid-rigging relative to the same products manufactured, distributed, and sold by Lear. Without question, a wire harness systems conspiracy existed as evidenced by numerous guilty pleas. Plaintiffs allege that Lear participated in the very same conspiracy. Lear had significant sales of wire harness systems — 5% of the market. Given these allegations, the Court rejects Lear's characterization of its involvement in this litigation as merely guilt by association. The fact that an antitrust conspiracy in the wire harness market existed when coupled with the type of market conditions that facilitate anticompetitive conduct, Lear's market share, and its association with Furukawa, when considered in total, raise a reasonable expectation that discovery will reveal additional evidence of illegal agreements relative to Lear. These allegations satisfy *Twombly.*

*Wire Harnesses,* 2013 WL 2456010, at *3.[1]

---

[1] Notably, Lear fails to even mention this decision in its initial brief in support of its present motion, much less suggest why the Court should not give it controlling weight in resolving the similar issue raised here.

8

Lear suggests three grounds for distinguishing this prior ruling, but none is persuasive. First, Lear appeals to a purported "change in circumstances" since the Court's ruling, where the DOJ and the European Commission have now "completed their investigations" without any findings that would implicate Lear in any wrongdoing. (Dkt. 66, Defendant Lear's Reply Br. at 4 n.5.) In its earlier decision, however, the Court was quite prepared to accept that Lear was not even a "named target" of the DOJ's investigation. *Wire Harnesses,* 2013 WL 2456010, at *3. Thus, the more recent confirmation that this investigation uncovered no evidence of Lear's wrongdoing is hardly a material change in circumstances that would warrant a different conclusion here. More generally, the case law confirms that the absence of criminal charges following a government investigation into suspected antitrust violations does not dictate the dismissal of a civil antitrust suit asserting the same or similar claims of anticompetitive conduct. *See Starr v. Sony BMG Music Entertainment,* 592 F.3d 314, 325 (2d Cir. 2010); *cf. In re Packaged Ice Antitrust Litigation,* 723 F. Supp.2d 987, 1011-12 (E.D. Mich. 2010); *In re Polypropylene Carpet Antitrust Litigation,* 178 F.R.D. 603, 619-20 (N.D. Ga. 1997).

Next, Lear contends that GEICO's complaint here differs from the pleadings under consideration in the Court's earlier ruling, in that GEICO has "attempted to bypass its pleading burden by fully adopting the DOJ investigation and guilty pleas" as the factual basis for its allegations that Lear participated in a conspiracy to fix prices for wire harness systems. (Defendant Lear's Reply Br. at 4.) As support for this assertion, Lear points to language in GEICO's complaint stating that the DOJ's "public announcements[] described how the Defendants and their co-conspirators carried out

9

the[ir] multiple [part-specific] conspiracies." (SAC at ¶ 127.) In Lear's view, this allegation evidences GEICO's intent to rely exclusively on the DOJ's announcements as "constitut[ing] the roadmap for the scope of the conspirac[ies]" pleaded in GEICO's complaint. (Defendant Lear's Motion to Dismiss, Br. in Support at 2.) Because Lear is "[c]ompletely absent from that roadmap," (*id.*), Lear surmises that it cannot be a part of the conspiracies "described" by the DOJ and alleged by GEICO in this case.

This is not a tenable reading of GEICO's complaint, as it places far too much importance on a single statement in a lengthy pleading. To be sure, GEICO does indeed allege that the DOJ's public announcements "described" the part-specific conspiracies giving rise to this suit and "how the Defendants and their co-conspirators carried [them] out." (SAC at ¶ 127.) Yet, this is hardly the same as alleging that the DOJ's investigative findings and ensuing criminal prosecutions define each and every detail of these alleged conspiracies, including their scope, the means through which they were carried out, and their participants.

Notably, the complaints under consideration in the Court's above-cited ruling in the multidistrict litigation also made fairly lengthy and detailed reference to the DOJ's investigation and the resulting criminal charges and guilty pleas. Indeed, Lear recognized as much in its motion to dismiss the claims asserted against it in the MDL. In that motion, as here, Lear observed (i) that in support of their claims against Lear, the plaintiffs had "rel[ied] upon criminal charges brought by the [DOJ] and guilty pleas entered by certain of Lear's competitors," but (ii) that "[t]he DOJ has never accused Lear of wrongdoing in connection with any conspiracy." *In re Automotive Parts Antitrust Litigation (In re Wire Harness Cases),* No. 12-md-02311, Dkt. 237, Defendant Lear's

10

Motion to Dismiss, Br. in Support at 1. To be sure, the MDL complaints apparently did not allege that the DOJ's public announcements "described" how the defendant auto suppliers in those cases carried out their conspiracies. Nonetheless, GEICO's choice of this particular word in its present complaint does not transform the allegations concerning the DOJ's investigation and public announcements — which, as Lear presumably would agree, are surely supportive of GEICO's claims of part-specific price-fixing conspiracies — into binding admissions that the DOJ's findings encompass the full scope of and participants in the conspiracies investigated by that agency. Accordingly, the Court rejects the notion that GEICO's allegations here reflect any intention to rely especially on the DOJ's investigative findings, in lieu of other allegations that would tend to establish Lear's involvement in one of the price-fixing conspiracies alleged in GEICO's complaint.

Finally, even accepting that GEICO does not rely solely on the DOJ's investigative findings and criminal charges to define the scope of the conspiracies alleged in its complaint, Lear argues that GEICO's remaining allegations lack the necessary specificity to support a plausible claim that Lear participated in a conspiracy to fix prices, rig bids, or allocate the market for wire harness systems. Once again, however, GEICO points out that this Court has already rejected a similar divide-and-conquer challenge advanced by Lear — in this instance, joined by its fellow defendants in the MDL wire harness cases, who collectively moved to dismiss a class action complaint brought by direct purchaser plaintiffs ("DPPs").

There, as here, Lear and its co-defendants argued that the DPPs' "generic allegations of misconduct" did not sufficiently specify each defendant's role in the

11

alleged conspiracy. *In re Automotive Parts Antitrust Litigation (In re Wire Harness Cases),* No. 12-00101, 2013 WL 2456584, at *5 (E.D. Mich. June 6, 2013). The Court disagreed, reasoning in part:

> In [their complaint], DPPs allege that "Defendants' pricing actions regarding their sales of Wire Harness Products to automobile manufacturers had an impact on prices for Wire Harness Products for all direct purchasers of Wire Harness Products throughout the United States." Again, although the [complaint] is not specific as to which parts in particular, and DPPs concede that the price fixing was directed at OEMs, this Court's obligation is not to nitpick the [complaint] line by line, paragraph by paragraph. The [complaint] identifies DPPs; it specifies which products were purchased; it includes the admissions contained in the guilty pleas of four corporate Defendants and seven individuals. It contains allegations as to the methods of communication used by Defendants and meetings between competitors; the scope of investigations by government entities as well as global coordination of the investigation. Taken together, the allegations articulate a plausible antitrust claim. Not only do [the defendants] have notice of the claims against them, the allegations create a reasonable expectation that discovery may reveal further evidence of an illegal agreement.

*Id.* at *6 (internal quotation marks and citations omitted). Again, Lear does not even acknowledge this ruling in the multidistrict litigation — and others like it, *see, e.g., In re Automotive Parts Antitrust Litigation (In re Fuel Senders),* 29 F. Supp.3d 982, 995-96 (E.D. Mich. 2014); *In re Automotive Parts Antitrust Litigation (In re Wire Harness Cases),* 2013 WL 2456586, at *3-*4 (E.D. Mich. June 6, 2013) — much less attempt to identify material differences between the pleadings in the MDL and GEICO's present complaint that might justify a different result in this case. Even if the Court were inclined to fashion arguments on Lear's behalf, no such material distinctions are evident.

12

Accordingly, the complaint is not subject to dismissal on any of the grounds set forth in Lear's motion.[2]

## V.   CONCLUSION

For these reasons, the Court **DENIES** the Lear Defendants' April 14, 2017 motion to dismiss (Dkt. 61).

**IT IS SO ORDERED.**

Date:   September 24, 2018

        s/Marianne O. Battani
        MARIANNE O. BATTANI
        United States District Judge

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on September 24, 2018.

        s/ Kay Doaks
        Case Manager

---

[2] At oral argument, counsel for Lear suggested an additional basis for dismissing the claims against Lear, asserting that the statutes of limitation governing these claims had run before GEICO commenced this suit. (*See* Case No. 12-md-02311, Dkt. 1843, 11/9/2017 Hearing Tr. at 92-93.)  Lear did not raise this issue in its briefing in support of its motion, however, and the Court declines to entertain a challenge advanced for the first time at oral argument.  To the extent that Lear's counsel merely sought to shed additional light on a statute of limitations argument raised in Defendants' collective motion to dismiss GEICO's complaint, the Court extensively addressed this issue in its separate ruling on Defendants' motion, (*see* 8/30/2018 Opinion and Order at 53-63), and need not repeat this discussion here.